## THE STATE v. HAGAN, Appellant.

### Division Two, November 12, 1901.

1. **Murder**: INDICTMENT: SUFFICIENCY. Where an indictment for murder contains no allegation that the person defendant is charged with having murdered is dead, the indictment is fatally defective.

2. ——: ——: ——: OMISSION OF MATERIAL WORD. And the indictment is equally defective when just before the conclusion it alleges, "of which mortal wounds, aforesaid, the said Harr then and there immediately and instantly die"—since it is evident that either the material word "*did*" or else the material word "*died* "was omitted. And in an indictment the rule is inflexible that nothing material can be supplied by intendment.

3. ——: SELF-DEFENSE: EVIDENCE. Defendant, a young man mentally and physically weak, was employed by deceased as a cook. Deceased was of a jealous disposition, and jealous of defendant. Deceased had previously threatened to kill defendant, and on the morning of the tragedy threatened to do him bodily injury. While defendant was washing dishes, he heard deceased and his wife talk of sending defendant away the next Sunday, and he offered to go at once. Deceased objected, and immediately started for defendant with a knife, declaring that he would kill defendant. Defendant ran, begging deceased not to hurt him, but deceased ran after, striking at defendant, with the knife at every jump. Defendant ran around the house and in at another door, seized a revolver which was lying on a wardrobe, ran outdoors, and again begged that he might go, but deceased continued to follow, when defendant shot, two balls entering deceased's chest, and defendant immediately went for assistance. *Held*, that the killing was clearly in self-defense, and a verdict of murder in the second degree was not justified.

State v. Hagan.

4. ———: DEFENDANT'S TESTIMONY IMPEACHED: LACK OF ORIGINAL TES-
TIMONY. In a case of homicide in the circumstances heretofore
stated, even if there be testimony impeaching that of defendant, still
such impeaching testimony could not supply the lack of original tes-
timony and thus convict the accused.

5. ———: CONFESSION: EXTORTED BY PROSECUTING ATTORNEY. The
practice of prosecuting attorneys acting as inquisitors and extorting
admissions or confessions from persons accused of crime is improper.

Appeal from Perry Circuit Court.—*Hon. H. C. Riley,* Judge.

REVERSED.

*John V. Noell* with *Killian & Greenwell* for appellant.

(1) The indictment is insufficient; the word "die" can
not be construed "died" or "did die." The death of the as-
saulted party is a necessary allegation in the indictment and
can not be supplied by intendment. State v. Furgerson, 152
Mo. 92, 63 S. W. 101; State v. Rector, 126 Mo. 328. (2)
Instruction 2, asked by defendant, presented the law as appli-
cable to the facts in this case, and should have been given. The
threats of deceased against defendant were admissible to char-
acterize the acts of deceased and for the purpose of showing that
deceased made the attack on defendant, and the error com-
mitted by the court is not cured by the giving of instruction 7
by the court of its own motion. State v. Elkins, 63 Mo. 159;
State v. Herrod, 102 Mo. 590; State v. Alexander, 66 Mo.
148; State v. Lee, 66 Mo. 165.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,*
Assistant Attorney-General, for the State.

(1) "Of which mortal wound aforesaid, the said Edward
Harr then and there immediately and instantly die" is suffi-
cient, though it might have been better to have added the letter

"d" to the word "die." The failure to so affix the letter "d" was merely clerical, which can not be said to reach to the substance of the indictment and does not in anywise prejudice the substantial rights of the accused. Sec. 2535, R. S. 1899. It can not be said of this indictment that the accused was not fully informed of the offense charged against him. State v. Edmunston, 64 Mo. 398; State v. Foster, 61 Mo. 549; State v. Counter, 46 Mo. 564; State v. Schloss, 93 Mo. 361; State v. Mills, 146 Mo. 195. Besides, mere bad spelling, when the meaning is plain, will not vitiate an indictment. State v. Lucas, 147 Mo. 70; State v. Vaughn, 141 Mo. 514. (2) Defendant's refused instruction numbered 2 is fully covered by instruction numbered 7, given by the court upon its own motion. That instruction fully covers the law of the case, so far as threats are concerned as applied to the plea of self-defense. By it the jury was given to understand that threats made by deceased against defendant and not communicated to defendant before the killing could only be considered in determining whether the deceased or the defendant made the first assault. But that if such threats had been previously communicated to the defendant they may be considered for the further purpose of determining whether or not defendant had reasonable cause to apprehend danger. State v. Harrod, 102 Mo. 570; State v. Hayden, 83 Mo. 198. Proof of uncommunicated threats of the deceased are to be considered solely in passing upon the question as to who was the aggressor. State v. Harris, 59 Mo. 550; State v. Sloan, 47 Mo. 604; State v. Rider, 90 Mo. 54. By defendant's refused instruction numbered 2, the jury were to be given the right to consider such threats in passing upon the question whether or not defendant believed, and had reasonable cause for believing, deceased was about to take his life or do him some personal injury, and that, too, without reference to whether the threats had been communicated to him or not. Such

is not the law. One against whom threats have been made is not justified in assaulting the threatener unless he makes some attempt to execute his threats. State v. Rider, 90 Mo. 54; State v. Hays, 23 Mo. 287; State v. Eaton, 75 Mo. 586.

SHERWOOD, P. J.—The defendant was indicted for the murder of one Edward Harr, by shooting him to death with a revolver. Florence Harr, the widow of deceased, was joined in the indictment with defendant, but on a trial previous to his, was acquitted. The jury found defendant guilty of murder in the second degree and assessed his punishment at thirty years in the penitentiary and he appeals.

The indictment in question was, in the charging part, as follows: "Do present and charge that Augustin Hagan and Florence Harr, late of the county aforesaid, on the twenty-eighth day of April, 1899, at and in the county of Perry, State of Missouri aforesaid, then and there in and upon one Edward Harr, there being, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did make an assault, and a certain revolving pistol, a deadly weapon, which was then and there loaded with gunpowder and leaden balls, and which they, the said Augustin Hagan and Florence Harr, in their hands then and there had and held, at and against the breast of him, the said Edward Harr, did then and there, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, shoot off and discharge at and upon him, the said Edward Harr, and with the revolving pistol aforesaid, loaded as aforesaid, and with the leaden balls aforesaid, then and there, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did shoot and strike him, the said Edward Harr, in and upon the breast of him, the said Edward Harr, thereby, then and there feloniously, willfully, deliberately,

premeditatedly and of their malice aforethought, giving to him, the said Edward Harr, in and upon the breast of him, the said Edward Harr, two mortal wounds, each of said mortal wounds being of the diameter of half an inch and of the depth of six inches, of which mortal wounds aforesaid the said Edward Harr then and there immediately and instantly die. And so the grand jurors aforesaid, upon their oath aforesaid, do charge and say that they, the said Augustin Hagan and Florence Harr, him, the said Edward Harr, at the time and place aforesaid, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did kill and murder, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State.        "SAMUEL BOND, Prosecuting Attorney."

A motion in arrest challenges the sufficiency of this indictment; the challenge is well grounded.    The indictment contains *no allegation that Edward Harr is dead*.    Touching this point, Hawkins says (Book 2, chap. 25, sec. 60): "Also it seems to be generally agreed, that no indictment of death can be good without an express allegation, that the deceased both received the hurt which is laid as the cause of his death, and also that he died of the hurt so received; and that the want thereof can not be made good by any implication whatsoever; as hath been more fully shown (chap. 23, secs. 82, 83).    Also it hath been adjudged that an indictment against J. S. for feloniously breaking such a prison, and commanding J. N. who was therein imprisoned for felony to escape, is not a good indictment for a felonious breaking, without expressly showing that J. S. did escape, and yet the breaking is expressly laid to be felonious, and it is impossible that it could be so, unless the party did escape. But it will be needless to enumerate any more instances of this kind, which are so very frequent that there is scarce any

case which mentions exceptions taken to indictments, without having some or other grounded on this rule, *that in an indictment nothing material shall be taken by intendment or implication."*

In another place, above referred to, the learned author says: "For it being the strict rule of law in these cases to have the substance of the fact expressed with precise certainty, the judges will suffer no argumentative certainty whatsoever to induce them to dispense with it. For if they should once be prevailed with to do it in one case, the like indulgence would be expected from them in others nearly resembling it, and then in others resembling those, and no one could say where this might end; which could not but endanger the subverting of one of the most fundamental principles of the law, by giving room to judges by arguments from what the jury have found, to convict a man of a fact which they have not found."

Other authorities pursue the same line of thought and theory.

If any fact, word or circumstance which forms a necessary ingredient in, or a material description of, the offense be omitted in the indictment, such omission vitiates the indictment and of such vitiation defendant may advantage himself by demurrer, motion in arrest or by writ of error.  [Rex v. Osmer, 5 East 304; Rex v. Everett, 8 B. & C. 114; Rex v. Norton, 8 C. & P. 196; Rex v. Jackson, 1 Leach 303].

The substantial description and outline of the charge in an indictment for murder done by violence are first, the felonious and mortal stroke given by defendant; second, the death of the person struck within a year and a day after receiving such stroke and in consequence thereof. So that, in the Latin forms, although the indictment charged *"dedit mortalem plagam,"* without saying *percussit,* the indictment was bad.  [2 Hale, 184, 186; Wharton Crim. Plead. and Prac., sec. 259.]

So with the omission or dropping of any other essentially descriptive word. Thus of dropping or omission of the word *"did"* where that word is essential to describe the criminal act done or the transpiring of some event necessary to the completion of the crime charged. [Whart. Crim. Plead. and Prac., sec. 275.]

Thus, in State v. Halder, 2 McCord 377, the indictment, which was for passing counterfeit money, charged that the defendant "feloniously utter and publish, dispose and pass," etc., etc.; but omitted the word *"did,"* before *utter,* etc., the court arrested the judgment because no charge was made that the prisoner *did* the act. To like effect is State v. Perry, 2 Bailey, L. 17.

In a number of instances in the State of Texas, the omission of the word "did," where necessary to describe the charge attempted to be made, has been held to make the indictment incurably defective (Moore v. State, 7 Tex. App. 42), and the omission was held a substantial defect in the indictment; one which necessarily went to the foundation of the prosecution.

Similar adjudications have occurred as to the effect of the omission of the same word. [Ewing v. State, 1 Tex. App. 362; State v. Hutchinson, 26 T. 111; State v. Daugherty, 30 Tex. 360; Edmundson v. State, 41 Tex. 496.]

This court has also held that the omission of the word "with" before the words "some heavy weapon or instrument" was fatal to the sufficiency of the indictment. [State v. Rector, 126 Mo. 328; State v. Furgerson, 152 Mo. 92; Same v. Same, 63 S. W. 101.]

Holding, then, the present indictment fatally defective because of the omission of the word "did" or because of the omission of the word "died," we reverse the judgment on that account.

But the judgment should be reversed for a still weightier

ground and reason: The evidence shows a very clear and in-
dubitable case of self-defense; and this, defendant chiefly relied
on. The testimony in this case has been read with great care,
and the statements in the briefs of opposing counsel as to the
facts do not materially disagree. The statement of counsel for
defense is substantially full and is the following:

Dr. Thos. M. Hudson, on part of the State: Am a physi-
cian and surgeon and coroner of Perry county, Missouri; as
such I held an inquest on the body of Edward Harr, at his
residence in said county and State on the twenty-eighth day of
April, 1899. The body was in the front yard, at southeast
corner of the house, near the cistern. He was lying on his
back, with his head thrown back and arms folded across body.
I found two bullet wounds, one in the left breast between the
fifth and sixth ribs and one in the right breast between the
fourth and fifth ribs. The one on the right was nearly hori-
zontal and the one on the left ranged a little bit downward.
Either wound was mortal. The one on the left would usually
cause instantaneous death, but it would not be impossible for a
person to walk or run a short distance after receiving it—
might have run from back of house. Found open knife under
left elbow of deceased.

Dr. Otto Turley: I saw the dead body of Edward Harr.
I think I got there about an hour after he was killed. I saw
the knife under his arm. His hand was clutched and one leg
drawn up a little, and there was dirt on both knees. (As to the
wounds and their effect, and the location of the body his testi-
mony is the same as that of Dr. Hudson.)

Wm. P. Franklin for the State: (Testified as to the loca-
tion of body and the knife, same as Drs. Hudson and Turley,
except that he did not notice the hands being closed.) I got
there about ten o'clock. Mr. Schamel was talking to defendant
in my presence. As well as I remember defendant said he

shot the man. He said he was in the kitchen and Harr came on him with his knife, and he begged Ed to let him alone. That Ed run at him and he run around the house and thought of the pistol and run in and got it and came out and shot him. He said Harr was after him and when he got to the cistern he thought of the pistol, got it and came out and begged Harr not to hurt him, said he got it off of the wardrobe. Showed us where he stood.

Martin Schamel, for State: I don't know that I am prepared to state what defendant said about the killing. Anyhow, he said that Ed was following him around the east end of the house with a knife and that he run in at the front door of the west room and got a revolver off a wardrobe, came down the steps in front of the porch and said he shot Ed, and Ed fell back just as he was. He showed us where he stood, it was eighteen or twenty feet from where the body lay. He said he did not know how many times he was shot. Me and Mr. Franklin and Dr. Turley were there. He testified to the same thing at the inquest. The knife was under Harr's arm and had the big blade open.

A. W. Thompson for the State: I got there about three-quarters of an hour after the shooting. (His testimony is same as others as to position of body, did not notice dust on knee or knife.) Hagan came out of the house soon after I got there and began talking about it. He said he was in one of the rooms and the first thing he knew Ed came in on him with a knife, and he run down the steps on the back part of the house, and Harr followed him around this way, east side, and he said when he got to these steps he thought of the pistol and he went in and got the pistol and came back down this way, and when he got here Ed turned here. He said Ed was here; he says I backed to here and he says he still advanced on me and I shot him. He said he shot twice but he didn't know whether he shot

State v. Hagan.

any more or not.    He said Ed was standing where he laid, that was about twenty feet from where he said he shot.    Hagan said he was about the plum tree when he shot.

Joseph E. Schremp, for the State:    I got there between 7 and 8 o'clock.    The body was lying within twelve inches of the porch, on south side of house with head to east and feet to west, open knife under edge of body under elbow.    Hands on breast.    Defendant said that Harr and his wife were talking in the room.    That he was in the kitchen fixing to wash the dishes.    They were talking about when they were to let him go, and all at once Ed came toward the kitchen with his knife, that he run out the door on north side of house and went round the east end and came to the door on the south side next to the west room, and that he went in and got the revolver and came back and ordered Harr to stop as he came around the corner of the house; he said he backed off to there and shot and when Harr started to fall, he turned around the other corner of the house and went to tell Càl. McLean.    It was about twenty feet as I judge, not more, from where he shot to where the body was lying.    Mr. McLean and Mr. Thompson were there when he told this.

State offered the statement of defendant before coroner's inquest—made the same day as above statements.    Statement in substance as follows:    I was cleaning up the dishes this morning.    Ed came in and swore he was going to kill me and began cutting at me with his knife, and run me around the east end of the house and cutting at me at every jump, and when I reached south side of the house I happened to think of the pistol.    I ran in and got it and stepped off the porch and told him four times and asked him to please let me go and not hurt me, and he said he wouldn't do it, that he would get the rifle and kill me.    I stepped back another step further and shot, don't know whether the shot hit him or not.    I don't recollect shoot-

ing but one shot.   The last I saw of him he was falling back throwing his hands up over his head.   I run on down and told Cal. McLean to hurry and come to the house that I had got in trouble with Ed and shot him. . . . . I suppose the pistol belonged to Mrs. Harr.   I was cooking for them, have been staying here two or three months.   He run me out of the kitchen door and run to the northwest corner and I turned and ran around the east side of the house.   Don't know what Mrs. Harr was doing during this time.   She did not have a hold of his arm when I shot him.   The last I recollect of Mrs. Harr she was in the kitchen.   She was in there when Ed said he would kill me.   They came in the kitchen together.

State then introduced statement of defendant taken by prosecuting attorney while defendant was in jail—in substance as follows:   Ed and wife were standing at gate talking, and Ed came in the kitchen and swore he was going to kill me, commenced cutting at me with his pocket knife.   I ran out of the kitchen door and ran around to the corner of the house by the fruit tree, dodged him but did not run around the fruit tree, and run around the corner of the house by the old cistern, every jump I made he was cutting at me.   I ran around the covered cistern and gained on him and happened to think of the pistol. I had seen it on top of the wardrobe, saw it was my only show. I came down off the steps and backed to where I did and asked four times to please let me go, the last time he said I will get the rifle and get you anyhow.   I remember firing only one shot, don't remember seeing Mrs. Harr after I ran out of the kitchen.   I never saw her where I made the turn by the plum tree.   I never saw Mrs. Harr when I shot.   Harr fell when I shot him.   The last I seen of him he was falling backwards. Harr was lying right close to the porch, right where I shot him. He had the knife in his hand at the end of the porch. . . . .

State then introduced testimony of defendant taken by

stenographer in the case of State v. Florence Harr—which in substance is as follows: I had piled up the dishes and thrown out the dish-water, when Ed and his wife came into the dining room. I think they came in through the kitchen. Ed was sitting in the window, his wife between the table and the wall. I heard them talking something about wanting me to leave, Ed was. I walked to the door and told him I would leave now, and he said, "I don't want you to leave now." I believe he said something about Sunday. I think my month was up in two or three days. Ed raised out of the window, he had a knife. I run out of the back dining-room door, and went around the house on the west side of the house. He was after me with a knife. It was open. Before he started he said, "God damn you, I will kill you!" I run up the front steps of the porch, run in a room, got on a chair and got the pistol off the wardrobe, the chair was standing there. Then I run through the room that leads into the room where the fireplace is and run in the kitchen door, the door was open, then run out of the dining-room door. Then I came back around the corner of the house and run around the plum tree and at the plum tree I fired a shot and then I came back around the plum tree and around this way and between a cistern and the garden. Ed Harr was cutting at me all the time and he said, "God damn you, I'll get the rifle!" Had an apron on that interfered with my running, a long apron. I could not get out of the yard, one gate was fastened with a chain and one was hooked on the outside and he headed me off; at the plum tree I turned and says, "Ed, let me go," and I fired two shots; he was about four feet from me then. The first shot he was about the same distance from me. The last I seen of him he was staggering backward. Did not see him fall. I then ran to see Cal. McLean. I shot to protect my life.

Cross-examination: The first I heard Ed and his wife

say was in the kitchen. I heard him say something about I would have to leave and I walked into the dinning room and leaned my arm up against the door and said I would leave now. He jumped out of the window and said, "I will kill you, God damn you!" I run out of the back door. I run around and came up and I can't tell you whether east or west but I came up the front steps. I run toward the cistern, didn't turn around the plum tree the first time, I run in the room, jumped on a chair and got the pistol off the wardrobe and run in the room where the fireplace was. Harr was right close after me with the knife when I run up the front steps. He followed me in the house, I got the pistol, he was still cutting at me. I run out and turned between the plum tree and the house. If I said I didn't fire any shot on the north side of the house I must have been mistaken. I don't know if I hit him the first time. He headed me off at the cistern and that is where I shot the last shots. I was excited and may have made different statements.

Florence Harr, widow of deceased, on part of defendant: My husband and I was standing at our front gate talking. He asked me if I would be willing to let the defendant leave on the next Sunday, the defendant was hired by us to do kitchen work. I worked in the garden and field with my husband. He preferred me to do so. I said, "Pa, go on to work and let's not have any trouble this morning." I went to the house and he followed me and sat down in the dining-room window. He then said: "Now will you let him go on Sunday." The defendant was in the kitchen washing dishes—he came to the dining-room door and said, "I'll go to-day." My husband said, "No, you will not go, I want you to stay here." My husband had his knife (the one found under his body) in his hand cleaning his finger nails, the big blade open. I asked him why he wanted him to go, and he answered, "The way things are

State v. Hagan.

carried on here." I said, "Do you know anything? Have you heard anything?" He said, "The fellow that stays here knows." Then he came toward me with a terrible look on his face. I stepped behind the dining table and said, "Pa, don't you touch me." He said, "I won't." He then turned to defendant and said, "I will kill you, God damn you!" He then started after the defendant with his knife in his hand, he ran him out of the back door, down three steps into the back yard. As he started after defendant I grabbed my husband by the arm and tried to stop him, but he jerked loose and jerked me out of the back door and ran after the defendant. The defendant ran around the house with my husband after him, up on the porch, through the room in which the wardrobe was and through the house in the back yard. He then ran around the plum tree in the back yard. My husband was close after him cutting at him with the knife. Defendant then turned and fired one shot. My husband threw up his hands and started toward the house, as soon as this shot was fired I fainted. When I came to I found myself on the front porch and my husband staggering toward the house in the front yard. He fell to his knees and I ran to him. I folded his hands across his breast after having tried to revive him. I called for help—called Cal. McLean, a work hand on the place. When defendant shot, my husband was right at him cutting at him with a knife. I only heard one shot, immediately after which I fainted. My husband weighed 159 or 160 pounds and was a larger and stronger man than defendant. It was my revolver. I kept it on top of the wardrobe. Never told defendant where it was.

Thos. McLean, for defendant: I lived on Harr's premises about three hundred yards from him. I heard two shots; about three-quarters of an hour before that Ed Harr had been to my house to borrow some coffee for breakfast. He then told my wife in my presence that he was going to punch the defend-

ant one before he left his house. I saw deceased a few minutes after he was killed and saw the open knife under his elbow.

Luvina McLean, for defendant: Edward Harr was at our house on the morning he was killed, he came to borrow some coffee for breakfast. This was about three-quarters of an hour before my husband claimed to hear the shots. Deceased then said that Gus Hagan had to leave and he thought he would have to punch him one before he left; I said, "I wouldn't use any such means," and he said, "I think I will have to punch him one whether he goes or stays." He was first talking about Gus and his wife. He said he was going to let him stay till Sunday.

James Golden, for defendant: I met Edward Harr at St. Marys about the middle of March, 1899, and heard him say that he had beaten and clubbed the defendant but could not drive him away and that he guessed he would have to kill him to get rid of him, but he hated to do that as he didn't want to have him on his hands.

Fannie Duvall, for defendant: I am a sister-in-law of Edward Harr. Just eight days before he was killed he was at my house and told me if he got a good chance he was going to kill Hagan with a chair and that if his wife put in he would give her some of it too.

Lawrence Smith, Vincent McCabe and A. W. Thompson testified that defendant's reputation for peace and quietude was good.

The defendant in his own behalf testified: I had just poured out my dishwater and was fixing to wash my dishes when Mr. and Mrs. Harr came into the dining room. I heard Ed say something about I would have to leave. I then came from the kitchen to the dining room and leaned against the door and said, "Ed, I will leave now." He said I should not leave, I should stay till Sunday. He then got up from the window and

started towards his wife. She said, "Don't touch me." He went on to say I would have to leave the way things were being carried on, and I said again, "I will leave now," and he made at me with his knife and said, "I will kill you, God damn you!" I ran out of the dining-room door, down the steps and around the house. I thought of the pistol, ran up the front steps onto the porch and then into the room where the wardrobe stands, stood on a chair and got the pistol from top of wardrobe, jumped down, ran into the room with fireplace, from there into the kitchen, then into the dinning room and out in the back yard. Ed Harr was still close after me with a knife in his hand. Near a plum tree in the back yard I wheeled and fired one shot. Ed Harr was right on to me cutting at me with his knife when I shot. I then ran around the plum tree and around the house to the front yard, when I reached the front yard I ran towards the front gate and aimed to run out of it but Ed Harr headed me off and was still after me. I was out of wind and when I found I could not get away from him I wheeled and fired two shots, after begging him to let me go, and he kept running after me with the knife, I wheeled and fired two shots. I then ran on around the house to the north gate, unchained it and went to Cal. McLean in the field. The last I saw of Ed Harr was just after I fired the two shots, he threw up his hands with the knife still in his hand. I had on my kitchen apron.

Calvin McLean, for defendant: Heard three shots. One, then a short time afterwards, two in quick succession. Thought I heard some one call me and I answered. I was two hundred or three hundred yards from house. Hagan came to me, had on apron. Had no hat on . . . . .

There were frequent threats indulged in against defendant, by Edward Harr. About two weeks before his death, Harr told a witness that the first chance he got he would make away with defendant. Harr told Golden, another witness, in

the middle of March, 1899, in the town of St. Marys: "I asked him who he had working for him and he says, there isn't anyone working for me; he says, Gus Hagan is there now but he ain't working for me. He says, I have beat him and clubbed him and he won't go away and he says I guess I will have to kill him, and he says he hated to do that. . . . . He said he hated to have to kill him to get rid of him. He hated to do that because he didn't want to have him on his hands or something like that."

To another witness just eight days before the tragedy, Harr said:

"Q. Did you ever hear Ed Harr make any threats against Gus Hagan? A. Yes, sir; just eight days before he was killed, he was at my house and he was speaking to me and he told me that if he caught a good chance he was going to kill Gus with a chair and he said if his wife put in he would also give her some of it too."

And even on the very morning of the tragedy, as seen above, Harr, a short while before it occurred, is making threats of inflicting personal chastisement on defendant.

One Edward Guyott testified that in October of 1898, which was over a year before defendant's trial occurred, defendant made, in his presence and to him, this threat about Ed Harr: "He said he was going to kill the son of a gun, the first chance he ever got." He afterwards testified that he could not remember how the subject came up, nor of any conversation defendant had prior to making that threat; that defendant was not angry at the time, and that this threat occurred six months prior to defendant's hiring out to Harr to work. At the time this supposed threat was made, it does not appear that defendant knew Harr, or had ever spoken to him.

Defendant, testifying in his own behalf, denied that he had ever made any such threat in Guyott's presence, and that

Guyott swore to a lie, when he so stated.

One Wm. Russell, testified that he was at Harr's on Tuesday next preceding the homicide; there to trade a little in hogs. Having stated this, thereupon the following transpired:

"Q.   What did Ed Harr tell you to do?

"What Ed Harr told him, we object to that.

"By Mr. Bond:   What I propose to show is that Mr. Ed Harr told this witness to tell Gus Hagan to leave the place, that he didn't want him to stay there and that this witness went and told Gus Hagan that, that is the object of the evidence.

"By the court:   He may tell what conversation he had with Hagan.

"A.   Well, I went in and asked for Mr. Hagan and asked him if he didn't think he was going to get in some trouble and he said he didn't know; I says I am afraid you will if you don't leave.

"Q.   State what you said to Mr. Hagan and what he said to you?

"A.   I said to him, you ought to leave here.

"Q.   What did he say?

"A.   Well, Gus says, I am here and I am going to stay, and I told him some of the boys wanted him to come down to a bouillon that night but he wouldn't tell me just for certain that he wouldn't do it; he says I am here and I am going to stay and he says if any of the boys want to see me I am here and I am going to stay here.

"Q.   Did you tell him that Harr wanted him to leave?

"We object.

"A.   I never told him that Ed wanted him to leave: I says you are going to get into trouble here.

"Q.   And what did he say?

"A.   He said he was there and he was going to stay there."

By saying what he did, the prosecuting attorney as effect-ually got before the jury that witness went to defendant at the direction of Harr, as if the witness had been permitted to tes-tify directly to that point. But it seems, that defendant was not told that Harr wished him to leave. And it is very singular indeed, if what Golden says is true, that Harr, having tried without success the persuasive powers of clubbings and beatings to get defendant to quit his service, should vainly imagine that a simple request would accomplish more than violent means would.

Calvin McLean testified that previously to the killing (how long, does not appear) he advised defendant to leave; that if witness were in defendant's place he would do so. That upon this, defendant told witness, "he was staying there to keep Ed and his wife together." That defendant was aware that Harr was jealous of him, and so stated.

Lawrence Kendrick testified that on the morning of April 28, 1899, he was working in a field about two hundred and fifty yards from the Harr house, the top of which only, could he see, when he heard one shot first, then in between three and five minutes, two quick ones; that he heard some crying and loud talking after the first shot fired, but could not understand what they were saying; that then he "understood some one to say: 'Drive him around here.'" Whose voice this was, he does not pretend to say. It would seem rather improbable that the witness, distant from the house in question, two hundred and fifty yards; a house whose top he could just see, could hear what was said in the yard of that house that morning. But aside from that, his testimony is wholly inadmissible, because one is not allowed to testify as to his *understanding* of a matter. [State v. Gritzner, 134 Mo. 512, and cas. cit.]

Harr was shown to be an inordinately jealous man; and on one occasion, some months before the homicide, at a ball at his

own house, he attempted to stab his wife with a butcher knife, merely because she had permitted John Duvall, a guest, to talk to her there.   Harr said at that time, he couldn't stand for any man to talk to his wife.   Defendant testified as to how he became aware of where the revolver was kept, about two weeks before the homicide.

Defendant was an undersized, runty specimen of humanity.   He could neither read nor write and owing to his not being strong, had learned how to cook, and that was his occupation.   His mental calibre was very small; he did not know his own age, saying of it that he was seventeen, but that his ma said he was twenty-one.   That Harr, influenced by jealousy, cherished murderous designs against defendant, the evidence already related abundantly establishes.   Whether there was any ground for Harr's jealousy we are not informed by anything stated on the part of the State, and on the part of the defense both Mrs. Harr and defendant deny that they had trespassed on the rules of propriety.   It may be that his wife and defendant had together partaken of *"the sweet and bitter apple that is always held out in the hand of Eve."*   Something of this sort would seem to be indicated by the questions she propounded to her husband on the morning of the fatal occurrence: "Do you know anything?"   "Have you heard anything?"   What it was that was the immediate cause of the conflict that arose between Harr and defendant, we can only know through what has been testified to by him and by Mrs. Harr, and by the circumstances and physical facts in evidence; and certainly those facts and circumstances strongly tend to corroborate the story they told when on the witness stand. If we take it that defendant's testimony when before the coroner and the statement that Bond, the prosecuting attorney, induced defendant to make when he was in prison; differ considerably from defendant's testimony when

Vol 164 mo—43

on the witness stand as to how the difficulty had its origin, still, the impeaching testimony, while it would overthrow to some extent defendant's testimony, its only effect would be impeaching; it could not and would not furnish any original evidence of defendant's guilt, nor have any tendency to establish it. But when the testimony of defendant taken before the coroner, and his statement aforesaid, taken while in jail, are examined, although differing in some of their features from his testimony on the stand, yet in substance and general outline and effect they are quite similar. In each instance, there are the oath-made threat of Harr to kill defendant; the assault upon him with the open knife; the close pursuit; the thought by defendant of the pistol; his procuring it; his continuing his flight; his still being pressed by Harr's pursuit; his vainly begging Harr to desist; and finally, the firing by defendant, of the fatal shots in self-defense. Besides, any discrepancies between the statements of defendant may readily be accounted for on two grounds: first, that defendant when testifying before the coroner, and when making the statement when in jail, were made when he was excited; and, second, that defendant was almost on the verge of being half-witted and was without counsel when testifying at the coroner's inquest. In State v. Young, 119 Mo. 495, a similar case to this one, it has been ruled that testimony of a party afterwards accused, if taken before a coroner, would be inadmissible on the trial of such party.

Then as to the statement taken by Bond, the prosecuting attorney, after defendant was in jail, defendant says in replying to the question:

"Q. What did Mr. Bond say to get that statement?

"A. Mr. Bond came up there and said that Mrs. Harr had made a statement, and said I had just as well, and said if I would do so it would be better for me."

This testimony of defendant, met with no denial by the prosecuting attorney, and of course, condemns the method there

employed, and the confession thus obtained.   The day seems to be distant in this State when prosecuting officers will learn that they are not *inquisitors* and that it is no part of their duty to endeavor to extort admissions or confessions from one accused of crime.

In conclusion, viewing the matter in every light, we have but to repeat the statement that a clear case of self-defense has been made out on behalf of defendant.

For this reason, as well as the one heretofore mentioned, the judgment will be reversed, and the defendant discharged. All concur.