State v. Bartlett.

# THE STATE v. BARTLETT, Appellant.

Division Two, December 16, 1902.

1. **Murder:** SELF-DEFENSE: EVIDENCE: SUFFICIENCY. Evidence in a prosecution for murder *held* to show that the killing was in self-defence, requiring the court to give the jury a peremptory instruction to find defendant not guilty.

2. **Assault:** RIGHT OF ASSAILED: RETREAT. A person who, when assailed, is in a place where he is lawfully entitled to be, is not bound to retreat before exercising his right of self-defense.

3. ———: ———: RESISTANCE. A person may resist a public whipping, and, if his physical inferiority to the assailant prevents a resistance, he may use a weapon with which to defend himself.

4. **Murder:** PROVOKING ATTACK: ERRONEOUS INSTRUCTION. Where, in a prosecution for murder, there was no evidence that defendent had circulated slanders about decedent's brother in order to provoke decedent to attack him, an instruction that, though deceased first assaulted defendant, yet if defendant, with preconceived malice, and in order to have an excuse for killing decedent, made false statements concerning the latter's brother, and so provoked decedent to attack him, defendant would be guilty of murder in the first degree in case he killed decedent, though the latter made the first assault, and no matter how severe the attack might have been, was erroneous.

5. **Instruction:** ABROGATING SELF-DEFENSE. The instruction was also erroneous as *abrogating all rights of self-defense.*

6. **Assault:** SLANDER NO JUSTIFICATION. Mere slanderous words of a person's brother do not justify such person in assaulting the slanderer.

7. **Murder:** SELF-DEFENSE: EVIDENCE: OBJECTION. Where in a prosecution for murder, defendant pleaded self-defense, an objection by defendant to evidence of his slanders of decedent's brother—offered for the purpose of showing an excuse for decedent's threatening and first assaulting defendant—that it was incompetent, immaterial, and irrelevant, was sufficient.

8.  ———: SLANDER: EVIDENCE: THREATS.  The evidence, in a prosecution for murder, of slanders of decedent's brother circulated by defendant, was only admissible on behalf of defendant to show threats made by decedent, and their basis and conditions.

9.  Information: AMENDMENT AFTER CHANGE OF VENUE.  An information can not be amended in the county in which the criminal case is pending after a change of venue has been granted, but the amended information must be filed in the original county.

Appeal from Lewis Circuit Court.—*Hon. E. R. McKee,* Judge.

REVERSED.

*Blair, Marchand & Rouse* for appellant.

(1)  Edwards was not and could not have been justified in his attack upon Bartlett on the day of the tragedy; and Bartlett, being pursued as he was, was clearly justified in firing upon Edwards as he did.  The office of Bartlett was as sacred to him as his castle or domicile.  Edwards could no more have claimed justification on his part, had he commenced an assault upon Bartlett outside of Bartlett's premises, and then forced Bartlett to retreat to the door of his domicile, than he could in this instance assault Bartlett on the street and force him to retreat to his office door.  Morgan v. Durfee, 69 Mo. 469; State v. Mathews, 148 Mo. 197.  (2) The State having failed to show that Bartlett brought on the conflict, or provoked the assault on March 8, that he might have an opportunity to wreak his revenge and malice upon Edwards by killing him, left Bartlett entitled to his full self-defense, and it was the duty of the court, then and there, upon the close of the State's evidence, to have so declared, and discharged Bartlett.  State v. Partlow, 90 Mo. 608; State v. Rapp, 142 Mo. 446; State v. Higgerson, 157 Mo. 400; State v. Bowles, 146 Mo. 17; State v. Hollingsworth, 156 Mo. 188; State v. Starr, 38 Mo. 275; State v. Eaton, 75 Mo. 592; Nicols v. Winfrey, 79 Mo. 547; State v. Harrod, 102 Mo. 612; State v. Hudspeth, 150 Mo. 33; State v. Evans, 124 Mo. 410; State v. Mathews, 148 Mo. 193; State v. Smith, 114 Mo.

State v. Bartlett.

418; State v. Sneed, 91 Mo. 559. (3) Instruction 16 is wrong because it is not warranted or supported by the law and evidence in the case. There is no evidence that Bartlett, with preconceived malice, and in order to have an excuse or pretext for killing Edwards, or for doing him great bodily harm, intentionally, by the utterance of false and degrading statements concerning the family of Edwards, provoked the deceased to wrath for the purpose of inciting Edwards to attack him, and make the first assault upon Bartlett, and hence should not have been given. There was no evidence showing that Bartlett brought on the attack for the purpose of wreaking his malice on Edwards. The State completely failed to prove this point, hence, the instruction is not warranted or supported by the evidence. (4) The evidence as to what Bartlett said about John A. Edwards being in jail or in the penitentiary, taking it as true, could under no circumstances be considered a legal provocation for William D. Edwards to assault Bartlett, Bartlett being unoffending. Coxey v. Whitney, 9 Mo. 531; Collins v. Todd, 17 Mo. 540; Murray v. Boyne, 42 Mo. 473; State v. Gamble, 119 Mo. 433; State v. Hudspeth, 150 Mo. 35; State v. Higgerson, 157 Mo. 400. (5) Defendant had the right when attacked to presume that the attack was to carry out the threats of Edwards. State v. Sloan, 47 Mo. 610; State v. Elkins, 63 Mo. 164; State v. Alexander, 66 Mo. 161; 1 Bish. New Cr. L., sec. 872, p. 525. Defendant may act more promptly when threats are made and communicated to him. State v. Evans, 65 Mo. 582. Where threats are communicated to defendant and he is assaulted, his right of self-defense exists, though his assailant only intended to frighten him. State v. Evans, supra.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1) There can be no question but that the prosecuting attorney had a right to amend his information if he saw proper to do so. Hughes Criminal Law and

Practice, sec. 2776; Long v. People, 145 Ill. 441; Truitt v. People, 88 Ill. 518; State v. Hubbard, 71 Vt. 405; State v. Stebbins, 29 Conn. 463; 1 Bishop's Criminal Practice (2 Ed.), sec. 1215. (2) From the evidence on the part of the State it shows that the defendant did not kill the deceased in self-defense, but that it was done under such circumstances as show him to be guilty of manslaughter in the fourth degree. At any rate, this was a question which was properly submitted to the jury, and while the evidence of the defense somewhat conflicts with that on the part of the State, yet the jury passed upon it under the instructions of the court and it is beyond the power of the defendant to urge objections to the sufficiency of the testimony at this time. (3) To obtain a verdict of acquittal, it should have appeared to the satisfaction of the jury that defendant apprehended a design on the part of Edwards to inflict death or great personal injury upon him; that defendant apprehended immediate danger of the design being executed by Edwards; that there was reasonable cause for such apprehension of danger, though not necessary that it should in fact exist, but that defendant should have apprehended and had reasonable cause for so apprehending. State v. Parker, 106 Mo. 217; State v. Bateswell, 105 Mo. 609; State v. Duncan, 116 Mo. 296. The apparent danger must be such from which the defendant must believe and have good reason to believe that he can not without further hazard deliver himself except by striking the fatal blow. State v. Wilson, 98 Mo. 440. The right to strike in self-defense does not arise until the person claiming it has done all things reasonable in his power to avoid it. State v. Kloss, 117 Mo. 592; State v. Lewis, 118 Mo. 79; State v. Hickam, 95 Mo. 322. The fact that deceased was advancing upon defendant as is contended in appellant's brief, with no reason on the part of the defendant to believe that it was with intent to kill or inflict great personal injury, did not justify the defendant in taking his life. State v. Brown, 64 Mo. 367.

SHERWOOD, P. J.—Prosecuted on information filed in the Scotland Circuit Court for the murder of William D. Edwards, on change of venue to Lewis county, defendant was found guilty of manslaughter in the fourth degree and his punishment assessed at two years in the penitentiary.

The amended information filed in Lewis county, by the prosecuting attorney of Scotland county, charged the crime to have been done by shooting Edwards to death with a revolver.

The testimony in the bill of exceptions in this cause, covers nearly seven hundred type-written pages. Of course there is no manner of necessity for covering such an *immense acreage* of space as this transcript covers. The whole meat of this case can, by proper condensation, find ample room in a transcript of one hundred pages or less. The controlling facts in this case are few and simple; but the *controlling* facts were not allowed to *control* in this instance as will presently be seen.

E. Russell Bartlett, the defendant, is something past middle age, almost blind by reason of near-sightedness and chronic weakness of the eyes; very frequently afflicted with rheumatism, and so very badly ruptured that often he would be in a dangerous condition for hours together, and would have to have immediate medical attention and relief. His eyesight was so short in its range that the paper he would read, he would have to hold within three or four inches of his eyes, and friends and relatives whom he would meet in the street or at home, he could not recognize only at a short distance, three or four feet, and but little further, and then only when the light was back of the person seeking recognition. But he could recognize persons by their voices, and by addressing him as they met or passed him on the street, was the usual and customary way his friends and acquaintances had of apprising him of their presence and identity.

It crops out in several places in this record that defendant had enemies, who it appears were some of those,

or else friendly to those men, several of whom for their *misdeeds* and *forged deeds,* defendant had assisted in prosecuting and in placing them in positions of *absolute security* in adjoining States to ours.    Defendant had been swindled out of some $750, by reason of a forged mortgage, and after that, seemed fully determined on giving to men who dealt in such wares, a vigorous and incessant prosecution.    Realizing how bitter his enemies were and how helpless was his condition, both because of defective vision as well as other more serious physical defects, already mentioned, he sent for his nephew, ''Bliss Glaze'', a boy about eighteen years old, who lived a few miles from Memphis, to come and stay with him and his family at his house, and be ''eyes'' for him, so as to notify him of approaching danger, and also to assist in case of attack.    This was some three weeks before the occurrence which gave origin to the present prosecution.    Defendant's wife was also seemingly apprehensive or cognizant of danger threatening him, for she let her nephew have some money with which to purchase a revolver, which he wore as he accompanied his uncle around the town of Memphis, and wore it regularly after the assault made on his uncle by William D. Edwards, at the Reveille office on the 5th of March.    At the foot of the stairway on the street, William D. Edwards, when he came down from the Reveille office, bawled out to defendant, who, having left that office, was then going up street, *''G—d d—n you, Bartlett, I'll get you yet.''*    To other persons on the next day after the scene in the Reveille office, William D. Edwards said Scotland county was not big enough for both him and defendant to live in.    To another witness, he said he was going to run a big bluff on defendant, etc.    Other threats of various kinds had been made by William D. Edwards against defendant and of these he had been warned on several occasions.    All of these threats were based on the failure of defendant to make retraction of a certain statement defendant had made of John A. Edwards, a brother of William D. Edwards, being in jail or in the penitentiary at Fairfield, Iowa.

Sometimes these threats were to the effect that if defendant did not retract the statement he had made about the brother of William D. Edwards, the latter would "horsewhip him just so as to disgrace him a little bit." Sometimes the threats were, "if he don't retract, I'll beat hell out of him." Sometimes the threat became murderous in its fierceness, to the effect "that unless he takes it back, I'll take my knife and cut the son of a b—h to pieces." At other times, William D. Edwards made similar threats about using a revolver on defendant, stating he had one, and a knife. Sometimes William D. Edwards being told that it would be dangerous to crowd on defendant, a crippled and weakly man; that he would shoot, replied, *"the boys says he won't."* Being told that he had better not assault defendant; that, in any event, he would be fined for doing so, replied that *"there's no danger of being fined in Memphis for beating Bartlett."* This last remark shows very clearly that the current of public feeling in Memphis, or at least that Edwards thought so, was evidently flowing against defendant. This fact is further exemplified by the additional fact that when William D. Edwards, with a revolver in his pocket, was lying in wait for defendant, on the 6th or 7th of March and telling witness what he would do, etc.; after finding Bartlett did not pass by, gave his revolver to a companion and went away.

Defendant, at the meeting in the Reveille office, had admitted to William D. Edwards that his brother was at Wichita and not in the penitentiary, but refused to sign the retraction tendered him, because, as he said at the time, this was not a fair statement. What were the contents of that paper, is like locating the grave of Moses.

Defendant, also, after going to Wichita, where he saw John A. Edwards, said sometime in December or January, after his return, that John A. Edwards was not the man. Some persons it seems, who knew John A. Edwards when he formerly lived in Scotland county, had told defendant that a photograph of Brown or

Bonner, etc., was a picture of John A. Edwards, and thus defendant was led into error by such misinformation. And defendant complying with a request from John A. Edwards, to that effect, sent for the Hydes, who, it seems, were cousins of John A. Edwards, frankly confessed his error, apologized for it, and requested them to inform William D. Edwards of the apology, but whether this message was ever delivered, does not appear.

To several other persons, defendant made similar statements, and requested them to tell his friends of what he had acknowledged.

On or about 1:30, in the afternoon of March 8th, defendant who had been suffering for two months with severe hemorrhage of the bowels, and was almost in a state of nervous prostration, at the request of his wife, because it was raining a little and he had recently suffered from rheumatism, took his daughter's umbrella, which she brought him (as she and a companion wished to use his), and started down town, accompanied by his nephew, "Glaze." This umbrella which defendant carried in his hand, had a half crooked handle, such as umbrellas usually have, and could readily be taken for a cane, were only the handle seen.

On arriving down town, as defendant and his nephew were approaching his office, or at least in the near vicinity of it, William D. Edwards, accompanied by his faithful lieutenant, Bob Board, Edwards with a raw hide whip covered with cloth, loaded with iron at the butt and weighing half a pound and which, with lash, measured five feet, came up behind defendant, when Edwards, without a word to defendant, began striking defendant over the shoulders and on the back of the head, with the lash of the whip with such force that the *swish* of the blows of the whip, according to one of the State's own witnesses, was so loud as to be heard by him clear across the square, a distance of some five hundred feet. At the same moment, Board, who pretends *he did not know Edwards "had a whip at the time,"* immediately sprang forward and caught defendant's

nephew, *"Glaze,"* and held him fast. Asked what Glaze had done to make him seize him, said *nothing* and finally being pressed for a reason, said, *"I caught him to keep him from catching Edwards."* One of Edwards' blows struck defendant in the back of the head, and the lash of the whip naturally flapped around, and doing so, struck defendant in the ball of his right eye, giving him great pain, and causing momentary blindness in that eye, and in the other also, through sympathy. This caused defendant to throw up his arms to protect his face, and he turned and tried to look at Edwards and then, maddened with pain, started on a run for his near-by office, Edwards following raining blows on his head and shoulders with the whip as he ran. While this was going on, and these parties were crossing the street towards defendant's office, two of the swift witnesses for the State, Bob Board and Lee T. Witty were heard to exclaim, *"Give it to him; beat hell out of him!"* Defendant out-distanced his pursuer a little, when he slackened his pace somewhat and endeavored to ascertain his bearings and turn his face towards his office; having done this, he ran toward the office steps, drew his eyes open, when Edwards, having come up, began raining blows over defendant's shoulders and on his face, a number of the blows striking him on his face, Edwards apparently striking so as to hit defendant's face entirely. Defendant having reached his office steps, and the blows temporarily ceasing, he hung his umbrella on his arm, when just then the blows began again, and defendant told Edwards, "stop or I'll hurt you," but Edwards continued to strike him, when the idea occurred to defendant if he could get into his office and lock the door he would be safe, so he sprang up the stairs rapidly, Edwards following and striking him all the way up. Having reached his office door, defendant seized the knob, tried to open it, but could not do it; it seemed to be locked; the blows from the whip were still descending, striking defendant on his head and hands, when defendant grabbed the door knob, tried again to open it, and failing again, drew his revolver

and said to Edwards, "Stop, or I'll kill you," when he said: *"You son of a bitch, I'll kill you yet,"* when Edwards struck him again, and then defendant fired.

Edwards still kept up his blows, apparently not having been hurt. When defendant again told him to stop, and the blows still continuing, defendant, after a few clumsy and nervous endeavors to fire the pistol, having caught the guard instead of the trigger, finally managed, by using his left hand, to reach the trigger— when the pistol fired and Edwards sank down on the steps, and being removed, died the next day.

That defendant apparently attempted to open his office door is abundantly sustained by the State's and other witnesses; their testimony is to the effect that he turned his face towards the door, seemed to be grabbing the door knob, and partly disappeared, but the evidence shows the doorjams are some nine inches thick and so defendant could partly disappear and still not open the door, and so his testimony on the subject stands uncontradicted, indeed supported, on this point. And it is also in evidence that the lock of the door in question was not infrequently *"out of kilter"* and would not work as it should; so that the door often seemed locked when it was not. Defendant having fired the last shot turned to his office door, took hold of the knob and the door opened. He testified that his impression was, at the time, that some one inside unlocked the door, but that, at any rate, the door opened when he took hold of the knob.

Defendant's *umbrella* was found on the stairway, but no *cane* was found on the premises. While Edwards was plying his whip to defendant, at the head of the stairs, and just before the first shot was fired, Mr. Lawrence testified to hearing some one in the crowd call out: *"Hit him, he dassent shoot!"*

Defendant freely admitted that at each time he fired, he fired to kill. That he had heard of the threats that were made by Edwards about him; that he thought he saw Edwards make a motion for a gun, and believing he would be killed unless he killed Edwards, he re-

solved to do the latter.    Another thing well calculated
to arouse apprehensions of serious danger in the mind
of defendant consisted in the fact that immediately as
he was struck by Edwards, at the same moment Board
seized and held his nephew, and prevented him from
coming to defendant's assistance.    This fact, coupled
with what Board on the same day told some two or
three witnesses that *"it was my business to catch
Glaze,"* shows *concerted action,* and that defendant had.
*more enemies than one.*

.    Defendant, when first assaulted and beaten by Ed-
wards on the street, was not bound to retreat to his of-
fice.    He had a right to be where he was, and the wrong
of Edwards in assaulting and beating him there, could
not deprive him of that right and so this court has, in
effect, decided.    [State v. Evans, 124 Mo. 397; see,
also, State v. Hudspeth, 150 Mo. loc. cit. 33, and cas.
cited.]    Because the right to *go* where one will without
let or hindrance, despite of threats made, necessarily
implies the right to *stay* where one will without let or
hindrance.    These remarks are controlled by the
thought of a lawful right to be in the particular locality
to which he goes, or in which he stays.

It is true, human *life* is sacred, but so is human
*liberty*; one is as dear in the eye of the law as the other,
and neither is to give way and surrender its legal status
in order that the other may exclusively exist, supposing
for a moment such an anomaly to be possible.    In other
words, the wrongful and violent act of one man shall
not abolish or even temporarily suspend the lawful and
constitutional right of his neighbor.    And this idea of
the non-necessity of retreating from any locality where
one has the right to be, is growing in favor, as all doc-
trines based upon sound reason inevitably will, and has
found voice and expression elsewhere.

Thus, the Supreme Court of Indiana, discussing
this subject, said:    "A very brief examination of the
American authorities makes it evident that the ancient
doctrine, as to the duty of a person assailed to retreat
as far as he can, before he is justified in repelling force

by force, has been greatly modified in this country, and has with us a much narrower application than formerly. Indeed, the tendency of the American mind seems to be very strongly against the enforcement of any rule which requires a person to flee when assailed, to avoid chastisement or even to save human life, and that tendency is well illustrated by the recent decisions of our courts, bearing on the general subject of the right of self-defense. The weight of modern authority, in our judgment, establishes the doctrine, that, when a person, being without fault and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force, and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable." [Runyan v. State, 57 Ind. 1. c. 84.] This ruling was quoted approvingly by the Supreme Court of the United States, in Beard v. United States, 158 U. S. 1. c. 561. See, also, 3 Rice's Evid., sec. 360.

In this case, however, defendant had brought himself strictly within the *old* rule of retreating to the wall, although he had done nothing to cause the assault made on him. Finding the door of his office would not open, he had a right, in the circumstances already related, to turn on his pursuing and persistent adversary and defend himself as best he could. [State v. Partlow, 90 Mo. 608, and many subseq. cas.]

We have carefully read this unusually long and uselessly long record, and considering the circumstances detailed therein; the physical condition of defendant; his badly ruptured state; the poorness of his eyesight and his infirm health; the danger which must have attended a personal struggle with an adversary by far his physical superior; the fierce and deadly threats made against him by Edwards in case he failed to retract; the fact that Edwards suddenly attacked him from behind on the public street, without saying a word or asking a retraction; the fact that his only protector, his nephew, was seized from behind and held by Bob Board, one of those leagued against him, and prevented from going to his rescue the very moment Edwards

struck him, showing concerted action against him; the fact that Edwards pursued him on the streets and up to his office door, still plying the whip; the fact that though warned by defendant to stop and to go back; the repetition by Edwards at that moment of one of the deadly threats of which defendant had heard so frequently and so recently, and finally the movement or apparent movement of Edwards to draw a weapon, made out such a situation and posture of affairs when taken all together, in justifying defendant in what he did do, and authorized the lower court on the coming in of all the testimony and evidence, to give the jury a peremptory instruction to bring in a verdict for defendant. [See remarks of GANTT, P. J., in State v. Talmage, 107 Mo. loc. cit. 572, and State v. Hagan, 164 Mo. 654.]

In such peculiar circumstances as this record discloses, and the physically infirm condition of defendant, the grounds of, and reasons for, self-defense, are necessarily and indubitably enlarged.

On the point of self-defense, it is aptly said by WAGNER, J.: "When a person apprehends that some one is about to do him great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, he may safely act upon appearances and even kill the assailant if that be necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterward turn out that the appearances were false, and there was, in fact, neither design to do him serious injury nor danger that it would be done. He must decide at his peril upon the force of the circumstances in which he is placed, for that is a matter which will be subject to judicial review. But he will not act at his peril of making that guilt, if appearances prove false which would be innocence had they proved proved true." [State v. Sloan, 47 Mo. loc. cit. 612.]

But nothing above asserted is intended to convey the idea that one man, because he is the physical inferior of another, from whatever cause such inferiority

may arise, is, because of such inferiority, bound to submit *to a public horsewhipping;* we hold it a *necessary self-defense* to *resist, resent* and *prevent* such a *humiliating indignity;* such a violation of the sacredness of one's person; and that if nature has not provided the means for such resistance, art may; in short, a weapon may be used to effect the unavoidable necessity.

On this topic of the sacredness of a man's person, an eminent text-writer says with his accustomed accuracy and force: "But any injury whatsoever, be it ever so small, being actually done to the person of a man, in an angry or revengeful, or rude or insolent manner, such as spitting in his face, or in any way touching him in anger, or violently jostling him out of the way, is a battery in the eye of the law. For the law can not draw the line between different degrees of violence, and, therefore, totally prohibits the first and lowest stage of it; every man's person being sacred, and no other having a right to meddle with it in any the slightest manner." [3 Russell on Crimes (Internat. Ed.), 1896.] To which may be added, that *human liberty is an inseparable attendant on the sacredness of a man's person,* and will not last long if the latter can be ruthlessly invaded without peril and without punishment, save the mere imposition of a nominal fine, or the recovery of cure damages.

This case was tried on the truly phenomenal theory that defendant *had been circulating slanders about William D. Edwards' brother, in order to provoke the latter to attack him.* This view is embodied in the following instruction given at the instance of the State:

"16. Although the evidence shows that the deceased first assaulted the defendant, still, if you believe that defendant with preconceived malice, and in order to have an excuse or pretext for killing William D. Edwards or for doing him some great bodily harm, intentionally by the utterance of false and degrading statements concerning the family of the deceased, provoked deceased to wrath for the purpose of inciting the deceased to attack him, and make the first assault, then,

in such case the killing of William D. Edwards would be murder in the first degree, no matter how severe may have been the attack of William D. Edwards upon him.''

In the first place there was no *evidence* to warrant such an instruction; in the second place there was no *law* to warrant such an instruction. Provocation, in such case, must be *personal,* and even then would not authorize, as does the litigated instruction, the infliction of a horsewhipping. Besides, that instruction abrogates all right of self-defense. All evidence about such slanders should have been rigorously excluded by the trial court when offered by the *State,* and only admitted on behalf of *defendant* to show threats made by William D. Edwards, and the basis and conditions of such threats. And though the objection to such supposed evidence, to-wit, that it was ''incompetent, immaterial and irrelevant,'' which Judge Ryland, away back in 21st Mo. said was *''no objection at all,''* and this court, every term of court since, still holds, as the evidence was *no evidence at all,* when offered by the State, such general *''sheet lightning''* objection was sufficient. [State v. Meyers, 99 Mo. 107, and subseq. cas.] It was thought necessary to note and notice the above point, lest through inadvertent tolerance,

> '' 'Twill be recorded for a precedent;
> And many an error, by the same example,
> Will rush into the state.''

The like considerations induce comment on the ''amended'' information filed in this cause in the circuit court of *Lewis* county, by the prosecuting attorney of *Scotland* county.

By the amendment to our Constitution adopted in 1900, it is provided that: ''No person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information, which shall be concurrent remedies.''

Prior to the adoption of this amendment, as is well known, felony could only have been prosecuted by *indictment.* When this was the constitutional rule and limitation, it was decided by this court in Slater's case,

72 Mo. 102, followed by many subsequent cases, that though authorized by statute the grand jury of *one* county, could not find an indictment for a crime committed in *another* county. Now the amendment declares that both these forms of procedure shall be ''concurrent remedies;'' if *concurrent,* then a prosecuting attorney of one county would have no greater power over an information which he could *file in his own county,* than would a grand jury over an indictment they had found in *their own county.* As they could not find one for a *crime* done *outside* of their own county, neither could he file an information *outside* of his own county for a crime done in his own county, unless the Constitution so permitted. And the mere fact that the general statute commands a prosecuting attorney to follow to other counties indictments and informations originating in his county, does not enlarge his powers as to amending an *information* any more than it does amending an indictment. The only way to get a new indictment, is to have new action taken by the grand jury of the original county; and the only way to have a new information, is to have the amended or new information filed in the original county.

This point was not raised in the motion in arrest, but being a matter of record, and a question of jurisdiction, we have thought best to notice it.

For the foregoing reasons we reverse the judgment and discharge the defendant.

All concur.