## TAYLOR v. THE PEOPLE.

1. CRIMINAL LAW—INFORMATION—WAIVING OBJECTIONS.

The objection that the defendant did not have a preliminary examination and the affidavit required by the information act was not filed should be made in the trial court; and if the defendant neglects to avail himself of his proper remedy at the proper time, he cannot be heard with respect thereto on appeal.

2. SAME—EVIDENCE—INTENTION.

In a homicide case, where the intention is material, the defendant may testify as to the intent with which he did the act charged, and may also testify as to what he thought the deceased intended to do when the act in question was committed.

3. EVIDENCE—ANIMUS OF WITNESS.

The animus of a witness may be shown, but a question for that purpose calling for a judgment and conclusion by the witness upon an assumed state of facts that was not shown to exist is improper.

4. CRIMINAL LAW—INSTRUCTIONS.

Where one paragraph of the charge defines murder of the first degree to be "unlawful killing of a person with malice aforethought," omitting the words "deliberation" and "premeditation," but several preceding and subsequent paragraphs of the same charge properly define and expressly instruct the jury that deliberation and premeditation are essential ingredients of the crime, there is no such inconsistency as will warrant the reversal of a judgment of conviction.

*Error to the District Court of Conejos County.*

AN information was filed in the district court of Conejos county charging the plaintiff in error, Abe Taylor, and William Thompson, with the murder of Charles Emerson,— Taylor as principal and Thompson as accessory. This information was verified by the district attorney, following which verification was an affidavit by Robert C. Cooper to the effect that the facts stated in the foregoing information were true, and the offense therein charged was committed of his (Cooper's) own personal knowledge. A plea of not guilty was entered, trial had upon the issue thus joined, and a verdict of guilty of murder of the first degree was returned

against Taylor. Upon this verdict the plaintiff in error was sentenced by the court to be hanged, and from this judgment he has brought his case here upon writ of error.

Mr. CHARLES A. JOHNSON and Mr. V. A. ELLIOTT, for plaintiff in error.

THE ATTORNEY GENERAL and Mr. F. P. SECOR, for the People.

MR. JUSTICE CAMPBELL delivered the opinion of the court.

Of the numerous errors assigned there are but three which we deem necessary to consider. The *first* relates to the right and authority of the district attorney to file the information; the *second* to erroneous rulings of the court upon the evidence; the *third* to errors in the instructions given by the court.

*First:* The general objection is urged by counsel for plaintiff in error that their client was tried and convicted without due process of law. The specific error assigned thereunder is that the defendant was given no preliminary examination, and did not waive the same. This being so, they contend that before the district court had any authority to allow an information to be filed, an affidavit, as provided for in section 8 of the information act of 1893, must first be filed, and that this was not done.

Neither a motion to quash, nor other pleading attacking the information upon any ground, was filed by the defendant; but, on the contrary, he entered his plea of not guilty, and went to trial upon the merits.

If there was no preliminary examination (as to which we are not advised by anything in the record), it was the duty of the defendant, at the proper time and in the proper proceeding, to show that fact to the district court, and the record should disclose the existence of the alleged defect in jurisdiction; and if, as a matter of fact, there was no preliminary

examination, and the affidavit required by section 8 had not been filed in the district court, it was likewise the duty of the defendant in an appropriate way to call the attention of the district court to the absence of the necessary affidavit; but as the defendant entirely neglected to avail himself of his proper remedy at the appropriate time, it is too late for him to be heard with respect thereto in this court, even if there be merit in his contention. *Brown v. The People*, 20 Colo. 161.

*Second:* A brief summary of the facts will elucidate the discussion of the errors assigned to the rulings of the trial court in sustaining objections to questions propounded by defendant's counsel. The evidence generally tended strongly to show that Taylor and his codefendant Thompson had stolen a wagon load of oats, which they had brought from near the town of La Jara to the town of Alamosa for the purpose of disposing of the same. The owner of the oats, having discovered the theft, gave notice thereof to a deputy sheriff at La Jara, who sent a telegram to Emerson, the town marshal and constable at Alamosa, requesting him to detain the supposed thieves.

Upon receipt of this message Emerson went to the store of one Gerteisen in the town of Alamosa, where Taylor at the time was trying to sell the oats, and after ascertaining that Taylor claimed to own the oats and to have them in his possession, Emerson, as an officer, placed Taylor under arrest, and informed him that he would have to remain in his custody until the subject of the larceny could be further investigated. Taylor asserted his innocence, and declared that there must be some mistake, but at that time made no resistance to the arrest, and submitted to the direction of Emerson to go with him to an elevator a short distance from the store, where the wagon containing the oats had been left by Taylor in charge of his codefendant Thompson.

On the way to the elevator, and after they reached the wagon, some conversation was had between Emerson and Taylor, in which Emerson explained to Taylor that his pur-

pose was to take the wagon to a livery stable, where it would be protected, and then take the defendants to jail. In pursuance of this intention, Emerson requested Taylor to get upon the wagon to drive the two teams of horses attached thereto; but Taylor, in turn, asked Emerson to drive the teams, stating that they were balky, and that he (Taylor) would make the leaders pull. Emerson complied with this request, and got into the wagon, while Taylor stood at the head of one of the lead horses and Thompson at the head of the other. The effort to start the horses was unsuccessful, and Emerson then called to Taylor to get into the wagon and drive the teams, as they would not pull for him. Apparently Taylor gave his consent to this, and started from the place where he was standing to get into the wagon from which Emerson was preparing to alight.

Taylor had upon his person, as he himself states, a revolver, but as he started towards the wagon, he either took from Thompson's person, or Thompson gave to him, a larger revolver, which he held in his hand as he advanced. Before Emerson alighted, Taylor says that he drew or threw his revolver upon Emerson, calling, "Hold up!" Almost immediately following this exclamation, Taylor fired one or more shots at Emerson, who returned the fire, and several shots were then exchanged by them, when Emerson fell, mortally wounded, and Taylor fled from the scene of the killing.

In this connection Taylor was asked by his counsel "what he thought Emerson was going to do as he jumped from the wagon." The court sustained the objection of the district attorney to this question, but no exception was saved by the defendant's counsel, and, strictly, he is not now entitled to press the error assigned. But we do not place our decision as to this ruling upon a technical ground. Unquestionably, in a criminal case, where the intention is material, the defendant may testify as to the intent with which he did the act charged. So, also, and for the same reason, he may testify as to what he thought the deceased intended to do

when the act in question was committed by the defendant. The court might well have allowed the question to be asked; but in a preceding part of his testimony Taylor had already testified that he saw that Emerson " aimed to jerk his gun and shoot " as he was about to jump from the wagon; and, in effect, assigned that fact as a reason for his own conduct. Therefore there was no reason for repeating an answer which had already been given.

Then, too, subsequently, in his cross-examination, the defendant testified that during all the time that he was under arrest he had upon his person a revolver; that when he started from the head of the lead team to get upon the wagon, he took from the person of Thompson a larger revolver, and that he did so because it was larger than the one that he had, and because it was the one with which he always practiced in shooting. Although the defendant was not asked the direct question why he fired the shots at Emerson, substantially he gave his reasons for so doing. In effect, he states that his object was, in the first place, to get a large revolver, and one with which he could do more effective execution, and thereby get the drop upon Emerson, and avoid any possibility of a fight; that he fired the first shot, not at Emerson's body, but at a distance of two or three feet away from him, so as to frighten the officer into subjection and prevent him from shooting; that when he discovered that Emerson was not to be deterred from his duty and was in the act of drawing his gun upon his assailant, Taylor states that he then fired to disable Emerson, so that the latter might not injure him, but in so doing he fired a shot that resulted in Emerson's death.

It will thus be seen that Taylor testified not only as to what he thought Emerson intended to do when he jumped from the wagon, but he also disclosed what his own intention was in firing the shots at Emerson, although his counsel did not see fit to ask him directly his reasons for shooting. The record therefore shows that the defendant got before the jury all that he desired for the purpose of throwing light upon

his motives, and disclosed to the jury the state of his mind at the time of the killing, and his own belief as to the intentions of Emerson. According to his own testimony and his own theory, his act was not justifiable in law. Being lawfully under arrest, without any provocation or excuse he assaulted the constable, thinking to frighten him, but when his efforts in that direction proved abortive, he shot for the express purpose of disabling the officer, and altogether succeeded in his efforts and killed him.

The plea of self-defense cannot be thus invoked when the supposed necessity is brought about by the unlawful conduct of the defendant himself; and the admitted statements of the defendant that he did not shoot until after he saw that Emerson intended to shoot at him, and that he himself fired the first shot to frighten, but not to injure, the officer, were before the jury to be considered by them as not only bearing upon the plea of self-defense, but as throwing light upon the degree of the homicide. In the light of these circumstances, the objection to this question was properly sustained.

Equally groundless is the assignment of error to the refusal of the court to allow the witness Johnson (witness for the people) to answer this question : " Did you not express yourself as freely as your neighbors there ; that he [meaning the defendant] should be summarily dealt with ? " Immediately preceding this question propounded by the attorney for the defendant, the witness in explaining his feeling in regard to the defendant had answered: " I felt that he [defendant] had done something entirely uncalled for ; "—referring to his killing of Emerson.

Unquestionably, the animus of a witness may be shown, and the refusal to permit proper testimony bearing upon the same would be error. This, however, was not a proper question. It assumed (what was not shown) that both Johnson and his neighbors had freely expressed themselves to the effect that the defendant should be summarily dealt with. It assumed, also, that Johnson knew of such expressions by his neighbors ; and, more than that, it called for a comparison

by the witness of the characterization of the conduct of Taylor by himself and his neighbors, and asked for a judgment and conclusion by the witness upon an assumed state of facts that was not shown to exist, as to the relative degree and intensity of the words employed by him and his neighbors. No argument is necessary to show that such question is improper. Besides this, no exception was taken to the ruling of the court sustaining the objection, and, what is of still more consequence in this discussion, the witness, who was a stranger to defendant, elsewhere in his cross-examination fully and frankly testified as to the nature of his feelings concerning the act of defendant in shooting.

*Third:* The instructions as given consisted of a general charge, and included the following:

"If you believe from the evidence, beyond a reasonable doubt, that the defendant Abe Taylor, within the county of Conejos and state of Colorado, at any time prior to the filing of the information in this case in this court, did feloniously, willfully, and of his malice aforethought, kill and murder said Charles H. Emerson, it will be your duty to find him guilty of murder in the first degree." * * *

In a previous part of this general charge the court had given to the jury the definition of the two degrees of murder, in the language of the statute, as follows:

"Murder is the unlawful killing of a human being, with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances, capable of proof. Malice is implied, when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart. All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any kind of willful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery,

mayhem or burglary, or perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, or perpetrated by any act greatly dangerous to the lives of others and indicating a depraved mind regardless of human life, is in law deemed murder of the first degree, and all other kinds of murder are deemed murder of the second degree; and if you find the defendant Abe Taylor guilty of murder in this case, it will be your duty to designate by your verdict whether it be murder of the first or second degree. "

The objection to this instruction is said to be that the court; in effect, tells the jury that it is their duty to find the defendant guilty of murder of the first degree if from the evidence they believe, beyond a reasonable doubt, that his crime was such as to render him guilty of murder of any degree. It is conceded that if, in addition to this instruction, and in connection with it, the words " deliberation " and " premeditation " had been used, the instruction would be good.

In *Hill v. The People*, 1 Colo. 436, and *Redus v. The People*, 10 Colo. 208, the words " malice aforethought " were held to be at least coextensive in meaning with " deliberation and premeditation." This doctrine has been condemned by Bishop in his work on Criminal Law, and approved by Mr. Wharton, but these cases announce the unquestioned law in this state. Counsel concede this, but insist that such meaning shall be given to these words only when they are employed in an information or an indictment; but that when used by the court in giving instructions to the jury, they shall be held to mean something less than, or different from, the meaning given to them when used in an indictment. It is argued that when used in an instruction the rules of evidence, and not the rules of pleading, are applicable. But we find it unnecessary to determine this question for the reason that this language is supplemented by that which occurs in the next succeeding paragraph, as follows:

" To constitute murder in the first degree there must have been an unlawful killing done purposely and with premeditated malice. If a person has actually formed the purpose maliciously to kill, and has deliberated and premeditated upon it before he performs the act, and then performs it, he is guilty of murder in the first degree, however short the time may have been between the purpose and the execution. It is not time that constitutes the distinctive difference between murder in the first and the second degree ; an unlawful killing with malice, deliberation and premeditation, constitutes the crime of murder in the first degree. It matters not how short the time, if but the time necessary for one thought to follow another, if the party has turned it over in his mind and weighed and deliberated upon it."

It will be observed that the jury in this one paragraph are three times expressly instructed that deliberation and premeditation, among other things, are essential ingredients of murder of the first degree, and the statutory degrees of murder were previously defined to them. With these three paragraphs of the general charge before them, we cannot see how the jury could have been misled or misdirected. But it is said that there is an inconsistency or antagonism between the second and third paragraphs quoted, and under the doctrine of *Clare v. The People*, 9 Colo. 122, which has been followed in other cases by this court, the judgment must be reversed, because it would be impossible for this court to determine which the jury followed, and which they rejected. But there is no such inconsistency present in this case. The most that can fairly be said is that the second paragraph by itself is not full or complete.

A careful reading of the evidence in this case satisfies us that the verdict was right, and the record shows that substantial justice was done the defendant. Upon more than one occasion, as in *Graves v. The People*, 18 Colo. 170, this court has not hesitated to reverse a criminal case where " substantial compliance with the rules governing the trial of criminal cases has not been had." But where, as in this

case, there can be no reasonable doubt as to the guilt of the defendant upon his own testimony, there should be an affirmance of the judgment if the defendant's trial was conducted in substantial conformity with the rules of criminal procedure.

In view of the foregoing considerations, the judgment of the district court is affirmed; and an order will be entered of record designating the calendar week commencing Sunday, December 8, A. D. 1895, for carrying the judgment of the district court into effect, as the statute provides.

*Affirmed.*