## THE STATE v. KELLY TURNER, Appellant.

Division Two, December 20, 1912.

1. **HOMICIDE:** Reasonable Doubt: Instructions: Cumulative. Where the court in a prosecution for murder had, at the State's instance, instructed on reasonable doubt, and had, at appellant's request, given additional liberal instructions on the same subject, there was no error in refusing to give still others which, in so far as they were sound, were merely cumulative and included definitions of reasonable doubt other than that uniformly approved.

2. ———: Good Character: Instructions. Where the defendant in a prosecution for murder put in evidence, for another purpose than that of proving good character, the record of the circuit court and the term reports showing that after conviction for an offense he had been paroled and had made, for some time, proof of good conduct at each term, the giving of the usual instruction on good character was not prejudicial to defendant in that it might have served to call the jury's attention to his failure to prove his good character.

3. ———: Self-Defense: Instructions. It was not error for the court, in a prosecution for murder, after fully instructing on the defendant's right to defend himself and his brother, to refuse an additional instruction on the same subject which, in effect, told the jury to measure the reasonableness of de-

fendant's apprehension by their idea of what a reasonably prudent man would have believed under the circumstances.

4. ———: Threats: Right to Arm: Instructions: Repeating Theory. Where the evidence in a prosecution for murder tended to show threats by the deceased, it was proper to instruct on the right of the defendant and his brother to arm themselves, but the defendant had no right to engraft upon such instructions a repetition of the law of self-defense, which had already been fully, clearly and fairly covered.

5. ———: Imperfect Self-Defense: Instructions. A defendant in a prosecution for murder cannot complain because of the court's refusal to instruct on the imperfect right of self-defense, where the instructions given accord him the full right of self-defense no matter who brought on the difficulty and without regard to the intent of the original aggressor.

6. ———: Right to Defend Brother. Where one witnesses from the beginning a difficulty between his brother and another, hears what is said and sees what is done, his right to defend his brother is the same as the right of the brother to defend himself.

7. ———: Assault Upon Brother: Provocation: Instructions. Where, in a prosecution for murder, there was substantial evidence tending to show that deceased wrongfully assaulted defendant's brother and, when the latter returned the blow, seized him around the neck and was holding him when defendant interposed and struck the fatal blow, the court should have instructed on manslaughter in the fourth degree, upon the hypothesis that the killing was without malice and in the heat of passion aroused in defendant's mind by the assault upon his brother.

8. ———: In Defense of Brother: Belief as to Brother's Danger: Evidence. Where in a prosecution for murder there is substantial evidence tending to show that the defendant gave the fatal blow to deceased while the latter was in the act of assaulting defendant's brother, defendant's testimony is admissible as to whether he believed his brother's life to be in danger when he struck. [Overruling, in part, White v. Maxcy, 64 Mo. 560; State v. Gonce, 87 Mo. 627, and State v. Downs, 91 Mo. 19.]

9. ———: Threats: Previous Arrest: Evidence. In a prosecution for murder evidence as to deceased's arrest, some time before the killing, at the instance of a brother of defendant, is competent in connection with threats made by deceased and as tending to show the basis of those threats, but where there was nothing in the offense for which deceased was arrested tending to indicate hostility toward defendant or his brother, the evidence should be limited to the proof of the arrest.

Appeal from Howard Circuit Court.—*Hon. Alonzo D. Burnes,* Judge.

REVERSED AND REMANDED.

*Samuel C. Major* for appellant.

(1)  (a)  The court erred in giving instruction 4 on behalf of the State.  The defendant did not attempt to prove his good character and the fact that he did not should not have been commented upon.  This instruction could but have been regarded as a comment on that fact and was very prejudicial to defendant.  (b)  The court erred in giving instruction 5. There was no evidence of any conspiracy between this defendant and any one.  (c)  Instruction 8 given by the court on the part of the State should not have been given.  The only witnesses who testified that the deceased used "opprobrious epithets and abusive words" also testified that he struck at the defendant's brother and at the time defendant cut him had the brother of the defendant about the neck and in his grasp.  We submit that this instruction could have had but one effect and that to confuse and mislead the jury.  If the defendant cut the deceased while the defendant was in a violent passion, suddenly aroused by the deceased assaulting the brother of the defendant by striking him and grabbing him about the neck (as testified to by the witnesses) then he was guilty of manslaughter in the fourth degree, and there should have been an instruction for manslaughter instead of this abstract proposition of law.  (2)  The court erred in refusing to permit the testimony of witnesses in regard to the previous trouble between the deceased and the Turner family, and refused to permit the defendant to show the nature and kind of said trouble, and the final disposition of the matter in the court of the justice of the peace.  It was relevant and competent as tending to

corroborate the defendant. It was relevant and competent to show the deceased's feelings towards the defendant and his brother, as showing who sought and brought on the difficulty and who was the aggressor. (3) The principal ground upon which defendant relies for a reversal is that, under the evidence in this case, the court should have instructed the jury on manslaughter in the fourth degree. Defendant is entitled to instructions based on his own unsupported testimony. State v. Darling, 199 Mo. 168; State v. Fredericks, 136 Mo. 51; State v. Anderson, 86 Mo. 309; State v. Partlow, 90 Mo. 608. In a prosecution for murder, whatever grades of the crime defendant's testimony may tend to prove should be covered by appropriate instructions, although his evidence may not be true. State v. Richardson, 194 Mo. 326. The court must submit the grades of the offense as shown by the testimony of the accused, though the testimony of the accused is uncorroborated. State v. Heath, 221 Mo. 565. "Nor would the shooting of a person be anything more than manslaughter where it was done in a moment of passion aroused by an assault upon, and wrongful treatment of the brother of the slayer." Wharton on Homicide (3 Ed.), sec. 183; Guffee v. State, 8 Tex. App. 187; 21 Cyc. 750; Collins v. United States, 150 U. S. 62; Warnach v. State, 3 Ga. App. 590; Willis v. State, 75 S. W. (Tex.) 790; Crockett v. Commonwealth, 100 Ky. 382; State v. Gallman, 79 S. C. 229; 13 Am. & Eng. Annotated Cases, note pp. 1084 and 1085; State v. Sebastain, 215 Mo. 80. The "fact that self-defense was sought to be shown does not render unnecessary an instruction authorizing a conviction, for manslaughter." Wharton on Homicide, sec. 165; State v. McKinzie, 102 Mo. 632; State v. Matthews, 148 Mo. 197; State v. Barrett, 203 Mo. 661; State v. Bates, 239 Mo. 507.

*Elliott W. Major*, Attorney-General, *Charles G. Revelle,* Assistant Attorney-General, and *A. W. Stewart* for the State.

(1) The court properly refused to admit testimony offered by the defendant in regard to a previous trouble between the deceased and the family of the brother of defendant. State v. Ramsey, 82 Mo. 137. (2) The court committed no error in modifying instruction 4 by striking out "apparently so." State v. Clay, 201 Mo. 688; State v. Frazier, 137 Mo. 333; State v. McKenzie, 177 Mo. 713; State v. Parker, 106 Mo. 225. (3) The refusal of an instruction is not erroneous when other instructions are given containing the same principle. State v. Walton, 74 Mo. 285. (4) If a person provokes a combat or brings on a difficulty, in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, and this without regard to the extent to which such person may have been reduced in the combat. State v. Darling, 202 Mo. 151; State v. Dunn, 80 Mo. 681; 2 Bishop Crim. Law, sec. 715; 1 Whart. Crim. Law (8 Ed.), secs. 474-476; State v. Christian, 66 Mo. 145; State v. Underwood, 57 Mo. 40; State v. Linney, 52 Mo. 40; State v. Starr, 38 Mo. 70. If the deceased made threats against defendant, and they were communicated to the defendant, still that would not justify the assault when the deceased was making no effort or attempt to carry out such threats. State v. Evans, 65 Mo. 581. The right to defend his brother was no greater than the brother's right to defend himself. State v. Melton, 102 Mo. 689; State v. Eastham, 240 Mo. 251. The evidence on the part of the State tended to show the difficulty which resulted in the death of deceased was sought for and brought on by the defendant; on the part of the defendant the evidence tended to show self-defense. If the jury believed the State, it was murder; if the jury believed the defense, it was

justifiable homicide. State v. Ramsey, 82 Mo. 138; State v. Jones, 79 Mo. 445. When the existence of deliberate malice in the slayer is once ascertained, its continuance down to the perpetration of the meditated act must be presumed, unless there is evidence to repel it. 1 Whart. Crim. Law (8 Ed.), secs. 477, 114. When the defendant a short. time before the killing had made threats against the deceased, an instruction for manslaughter would not have been proper. State v. Johnson, 76 Mo. 128.

BLAIR, C.—Appellant, his brother Dudley Turner, and Worth Lee were jointly indicted in the Howard Circuit Court for murder. Appellant was tried separately, convicted of murder in the second degree and sentenced to the penitentiary for a term of ten years. From that sentence this appeal was taken. The killing occurred at the town of New Franklin about 11 p. m. August 27, 1910. Johnson, the deceased, was a very large man, being six feet, six inches tall, weighing two hundred and eighty pounds and possessing unusual strength. During the afternoon of August 27, he, with two companions, Carson and Miller, had been drinking beer and whiskey but the evidence leaves it doubtful to what extent he was affected by his indulgence though the evidence for the State tends to show he was conducting himself peaceably at all times. Appellant and his brother and Lee came into New. Franklin between four and five o'clock, an hour or so after deceased arrived there, and there is some evidence Dudley Turner had been drinking but there is no evidence he was under the influence of liquor at the time of the tragedy. In view of the character of the questions presented it is unnecessary to set out in detail the testimony of the State's witnesses. There was some, though not much, evidence tending to show a conspiracy on the part of the three defendants to attack deceased but there is little if anything, unless it be the event, to indicate the

purpose of the conspiracy, if it existed, whether felonious or otherwise. At some time that evening Dudley Turner had supplied himself with what the witnesses term a wagon hammer but it does not appear when or where he did so nor that appellant was aware his brother was armed. So far as concerns the occurrence at the time of the killing there is some disagreement among the witnesses for the State, owing largely to the excitement, the crowd and the darkness. Without further discussing or attempting to harmonize these discrepancies it is sufficient for the purposes of this appeal to say there was, on the part of the State, substantial evidence that Dudley Turner accosted deceased, telling him he wanted to see him, and when the latter approached called him to account for alleged abuse of appellant earlier in the evening, called him vile names, told him he would hit him with his hammer, seized him by the hand and twice struck him on the shoulder. At this juncture appellant, who had been standing near cursing and swearing, stepped close to deceased and stabbed him in the abdomen, inflicting a wound from which death ensued in a few days. According to some of the witnesses deceased during this time made no effort to defend himself in any way and said nothing save that he did not want to fight, except that when Dudley Turner struck him deceased told him not to strike him again. The evidence for appellant, in several particulars corroborated by that for the State, tended to show deceased had long borne a grudge against the Turners, due to the fact James Turner once had him arrested; there was evidence he had made threats he would "get revenge on the Turners" and but a short time before he was killed in referring to defendants had said, in the presence of several people, he could "clean up that gang very easily." According to witnesses for both the State and appellant there was no truculence in Dudley Turner's manner or tone when he first accosted deceased and

told him he wanted to see him and the evidence for appellant is that when deceased came to where Dudley Turner was standing the latter asked him why he had cursed and abused appellant, adding he didn't want any trouble and wasn't going to have any trouble; that deceased replied "You are breeding trouble, yourself." Dudley Turner also said to deceased that he had cursed appellant "for everything he could think of" and added he "wouldn't stand for any man to abuse his mother." Deceased then began cursing Dudley Turner, called him a "God damn four eyed son-of-a-bitch" and struck at him. As he did so the latter caught deceased's arm and struck him.

Dudley Turner testified appellant had told him a short time before the killing occurred, that he had been offered whiskey by deceased and Carson and upon his refusal to drink they had cursed him and called him vile names and threatened to "pour it down him," that when appellant started away deceased followed, seized his arm and jerked him back and told him they would "whip him right there" if he "opened his damned head;" deceased, so appellant told Dudley, added that they—himself and Carson—were going to "get" the Lees and Turners before they left town. Dudley Turner's testimony was, further, that he next saw deceased near Clark's store, where the horses of both were hitched, and that Miller and Carson were also there; that he told deceased he would like to speak to him a minute and when deceased came to him he asked why he had abused appellant, made him drink whiskey and called him a son-of-a-bitch; deceased said he meant it, had "had it in for" the brothers a long time; on being charged again with calling appellant a "little short son-of-a-bitch" deceased said "Yes, and you are a four-eyed son-of-a-bitch. Help yourself." Dudley Turney says he replied: "Never mind that. I have got as good a mother as anybody has got. I believe in taking up for her" and thereupon deceased

struck at him and then he, Turner, hit deceased with the wagon hammer and the latter "clinched him around the neck" with his left arm and "was fixing to hit him or cut him, he didn't know which." He was holding deceased's right hand with his own left and at that moment appellant ran up and stabbed deceased. As the latter turned, Dudley Turner, according to his testimony, "kind of hit him on the shoulder" again.

Appellant, who was twenty-two years old when the killing occurred, is small, weighing 125 pounds. He testified that a short time before he stabbed deceased the latter called him and offered him whiskey which he declined to drink, when deceased called him a God damned son-of-a-bitch and told him he would drink it or he, deceased, would pour it down him. Thus urged, he drank and deceased assumed a threatening attitude and with curses declared he and Carson were going to "get" the Turners and Lees before they left town, adding he hadn't forgotten the time James Turner had him arrested. Appellant says that when he started away deceased followed, seized his arm and, with curses and vile epithets, told him if he opened his mouth they would "fix him right there." Appellant told deceased he was under parole and didn't want any trouble and deceased declared he would be in yet more trouble before he left town. Leaving deceased and Carson appellant says he met his brother and told him of the occurrence and of the threats Johnson had made. Appellant's story of the occurrences at the time of the killing was as follows:

"A. J. W. Wayland and I were standing down there by Clark's block that runs west from the store, talking. I heard my brother call Mr. Johnson in a very peaceable kind of a way, and asked him why he had cussed my brother, cussed him and abused him like he did; threatened he was going to get the Lee boys and me and him before we left town. He said he

had it in for us for quite awhile. Mr. Johnson said 'Yes, I did it.' He said 'if. I can't do it by myself, I have got a partner that can help me.' He says 'You God damn big four eyed son-of-a-bitch.' My brother says 'You big four hundred pounder son-of-a-bitch,' he says 'I am not afraid of you if you weigh a thousand pounds,' and they went to fighting. Mr. Johnson struck at him. As well as I could tell, my brother grabbed Mr. Johnson's right arm and then they clinched. Mr. Johnson had his arm around my brother's neck something like that. That was the position they were in when I cut him.

"Q. How many times did you cut him? A. Only once."

Appellant further testified he struck deceased with the knife because he thought "he had the best of my brother. . . . Mr. Johnson was too big a man; he had the best of him" and he thought he "would cut him and get him loose" from his brother; thought deceased was going to hurt his brother. It further appeared from appellant's testimony that he arrived on the scene in time to hear the conversation between his brother and deceased and saw all that happened but took no part in the controversy until deceased began the conflict with Dudley Turner, received the counter blow and had seized Dudley by the neck. In several important particulars Dudley Turner and appellant are corroborated by witnesses for both the State and the defense.

There was evidence that immediately after cutting Johnson, appellant walked out among the bystanders and said, "Boys, I done it," and added, "The penitentiary is my home."

Rulings of the court in giving, refusing and modifying instructions and its ruling excluding the particulars of the difficulty in connection with which James Turner had deceased arrested are assigned for error.

I. The court having, at the State's instance, instructed on reasonable doubt in accordance with approved principles (State v. Cushenberry, 157 Mo. 1. c. 181, 182; State v. Holloway, 156 Mo. 1. c. 227, 228, and cases cited) and having, on appellant's request, given additional liberal instructions on the same subject, there was no error in its refusal of still others which, in so far as they were sound, were merely cumulative. The refused instructions also included definitions of reasonable doubt other than that uniformly approved and for that reason also (State v. Nerzinger, 220 Mo. 1. c. 49, *et seq.*) the ruling was not erroneous.

II. The usual instruction on good character was given. It is insisted there was no evidence on which to base it and that its effect was to call the jury's attention to appellant's failure to prove his good character. Appellant offered the record of the circuit court of Howard county showing he had been theretofore paroled, after conviction for some offense, and offered particularly the term reports, running through a considerable period, showing that at each term he had made proof of good conduct. That the record was actually offered and admitted for another purpose did not destroy its tendency to establish good conduct and good conduct is evidence of good character. General good reputation, the fruit of good conduct, is usually requisite in proof of good character, but the rule excluding the good conduct itself and requiring evidence of reputation is not based upon such conduct's lack of tendency to prove good character. In fact the admission of the evidence of general good reputation necessarily is predicated upon and a recognition of such a tendency, and formerly specific acts of good conduct were permitted to be shown in proof of good character. These are now, generally, excluded because a contrary rule would result in "surprise and a confusion of issues" (1 Wigmore on Evidence, sec. 195) and not

because they lack probative force. On this record it is not necessary to decide whether a failure to instruct on good character would have been error nor whether in the absence of evidence on the subject it would be error to so instruct. What we do hold is that, in the circumstances, the instruction given was in no way prejudicial.

III. After fully instructing on appellant's right to defend himself and his brother the court refused an additional instruction on the same subject which, in effect, told the jury to measure the reasonableness of defendant's apprehension by their idea as to what a *reasonably prudent man* would have believed under the circumstances. The jury had been several times correctly told that if they found that *defendant*, under all the circumstances, had reasonable cause to believe and did believe either he or his brother was in danger of death or serious injury and struck to avert such injury they must acquit. This is the true rule and the court was right in refusing the instruction mentioned.

IV. In view of the evidence tending to show threats by deceased, there was no impropriety in instructing on the right of appellant and his brother to arm themselves, and the court, having already very fully, clearly and fairly instructed on the rule as to the right of appellant to defend himself and his brother, would have been entirely justified in striking from the instruction on the right to arm the attempted repetition of the law of self-defense, etc. If a like instruction is given on a retrial that part of it relating to defensive action should be modified so as to be in full harmony with the rule as announced by the court in the other instructions on the same subject.

V. The serious question in this case pertains to the denial of instructions on manslaughter in the fourth degree. So far as concerns the court's refusal to instruct on the imperfect right of self-defense appellant has no reason to complain since the instructions given accord him the full right of self-defense no matter who brought on the difficulty and without regard to the intent of the original aggressor. Whether the court should have instructed upon the hypothesis that the killing was without malice and in the heat of passion aroused in appellant's mind by an assault upon his brother, is a different matter. Since, according to his testimony, appellant witnessed from its beginning the difficulty between Dudley Turner and deceased, heard what was said and saw what was done, his right to defend his brother was the same as the right of the brother to defend himself and it is unnecessary to discuss the somewhat conflicting decisions (State v. Melton, 102 Mo. l. c. 688; State v. Hickam, 95 Mo. l. c. 332; State v. Hays, 67 Mo. 692; State v. Harper, 149 Mo. l. c. 522) relating to one's right, in the absence of knowledge of the origin of the difficulty, to defend a relative who is in the wrong. The instructions given recognized fully the right of appellant to do in his brother's defense anything the brother might himself lawfully have done in the circumstances.

There was substantial evidence tending to show deceased wrongfully assaulted Dudley Turner and, when the latter returned the blow, seized him around the neck and was holding him and endeavoring to do him further violence when appellant interposed. In this connection must be taken into consideration the disparity in size and strength between Dudley Turner and deceased, the prevailing excitement and the darkness. In these circumstances it is clear that if Dudley Turner had struck the fatal blow and been on trial an instruction on manslaughter in the fourth degree, hypothesizing a killing without malice and in the heat

of passion arising from lawful provocation, would have been warranted and necessary and a conviction of that offense would have been sustained by adequate evidence. There was evidence of reasonable provocation given Dudley Turner and, on this record, whether that evidence was true and, if true, whether it engendered the requisite passion and, if so, whether the blow was attributable to that passion or to malice would, had he killed Johnson, have been questions for the jury.

Was appellant entitled to a like instruction? The question involved has not been decided in this State, though the right of one brother to defend another and certain limitations on that right have been recognized. [State v. Eastham, 240 Mo. 241.]

Like questions have been frequently discussed elsewhere. Mr. Wharton (Wharton on Homicide [3 Ed.], Sec. 183) says:

"To mitigate a homicide it is not necessary that the assault or other provocation should have been made upon, or given to, the slayer; an assault upon a near relative may serve as an adequate provocation to reduce killing the assailant to manslaughter, as well as an assault upon the slayer. . . . Nor would the shooting of a person be anything more than manslaughter where it was done in a moment of passion aroused by an assault upon, and wrongful treatment of, the brother of the slayer."

In the case of State v. Warnack, 3 Ga. App. 590, there was evidence tending to show that the defendant's brother had used some offensive language toward one Wilson and the latter had armed himself with a plank, seized the brother by the collar and was struggling with him and demanding that he retract when defendant, after calling upon Wilson to release his brother, struck him with a brake stick and killed him. The court held that if defendant "struck deceased not for the purpose of defending his brother

from what he honestly believed to be a felonious assault, but from sudden heat of passion aroused by the attack upon his brother, intending to kill the deceased, he would be guilty of voluntary manslaughter," and that an instruction on that subject should have been given.

In Gills v. Com., 18 Ky. L. Rep. 560, the facts were that deceased got into an altercation with two brothers and twice struck at one of them with a knife when the other fired the fatal shot. The court took for granted the necessity of an instruction on voluntary manslaughter and gave directions as to a correct instruction on killing in heat of passion and without malice.

In Crockett v. Com., 100 Ky. 382, there was evidence tending to show that one Kidd had applied opprobrious epithets to John Crockett and had been knocked down and had arisen and was pursuing him, and the latter was firing shots over Kidd's head when Crockett's brother James shot and killed Kidd. In the case against James Crockett the court tacitly recognized the propriety of instructing on voluntary manslaughter and approved an instruction submitting the question of the existence of passion due to reasonable provocation.

In the case of Maria v. State, 28 Tex. 698, it was held that the whipping of defendant's child by another was adequate provocation to reduce the offense to manslaughter if the jury found the killing was done in the heat of passion engendered by such provocation.

Several decisions (Reg. v. Harrington, 10 Cox C. C. 370; Campbell v. Com., 88 Ky. 402) support the doctrine that it is no more than manslaughter if the defendant struck the fatal blow in the heat of passion engendered by seeing or soon after hearing of an assault upon his daughter by her husband (the deceased), though the assault did not endanger life. It has been held but manslaughter (McLaurin v. State, 64 Miss. 529) when a husband kills a woman who has violently

assailed his wife, if the killing resulted from passion arising from the assault.

In other cases it has been declared that one whose brother has been unlawfully slain in his presence and who immediately in the heat of passion thereby aroused, kills the slayer, is guilty of manslaughter only. [State v. Horn, 116 N. C. 1037; Young v. State, 41 Tex. Cr. Rep. 442; Guffee v. State, 8 Tex. App. 187.]

In the case of Collins v. United States, 150 U. S. 62, the United States Supreme Court approved an instruction for voluntary manslaughter in a case in which there was evidence tending to show defendant shot deceased after the latter had slapped the former's twelve year old brother. The conviction was for murder but it would seem that if the provocation was not sufficient to require an instruction on manslaughter it would have been unnecessary to discuss the instruction given on that subject.

What constitutes lawful provocation is not always easy to decide. Mr. Bishop (2 Bishop's New. Crim. Law, Sec. 710) says the "test [of provocation] is not whether what he did is indictable, but whether the law deems it calculated to excite passions beyond control;" a definition of little value save in so far as it eliminates the necessity of indictability in the provocative act. As said in Campbell v. Com., supra, "the law in its wisdom, looking to the frailty of human nature, and the passions common to all men, where there is sufficient provocation, will punish for the lesser offense; but, as said by CHRISTIANCY, J., in the case of Maher v. The People, 10 Mich. 212, 'provocation will be given without reference to any previous model, and the passions they excite will not consult precedent.'"

In connection with a somewhat similar question it was said by the court in Guffee v. State, supra: "Down deep in the human heart there is an abiding love for our kith and kin, which intensifies as we ap-

proach a common parentage. A brother's virtues are magnified and his faults overlooked, and upon summons we fly to his relief without pausing to contemplate the consequences to ourselves, or taking much time to consider whether, in the particular instance, he is in the right or the wrong. It suffices usually for us to know that he is in danger and needs our assistance, and we blindly follow that impulse born in us, and which impels us to rush to the rescue and save him from harm and leaves us to contemplate our actions after the danger has passed and reason has resumed its sway. This infirmity (or virtue) in human nature cannot be ignored in the practical administration of justice. . . . ''

This view of the intimacy of the fraternal relation has received, to some extent, statutory and judicial recognition in this State (Sec. 4451, R. S. 1909; State v. Eastham, supra), and we think the reason of the thing, as well as the reasoning of the cases cited from other jurisdictions, entitled appellant, on the evidence in this case, to the instruction mentioned. There was evidence, it is true, that the killing was without provocation and malicious. On the other hand there was evidence that appellant had been himself cursed, threatened and assaulted by deceased but a short time previously, and that when Dudley Turner peaceably remonstrated with deceased for this treatment of appellant, he also was threatened, abused and, in the darkness of night, assaulted; and when he attempted to defend himself was seized about the neck by an opponent, greatly his superior in physical strength, and further violence was about to be done him. That Dudley Turner was practically helpless in deceased's grasp is clearly inferable if the evidence for the defense is to be believed. Of course, if the testimony of some of the State's witnesses is true, there was no assault on Dudley Turney, and appellant's act was wholly unprovoked, but the truth or falsity of the evidence

was a question for the jury to determine. If the evidence for the defense was believed by the jury, yet they could have concluded appellant's act was not justifiable and done in defense of himself or his brother, and if they so concluded there was no alternative, under the instructions, but to convict of murder in the second degree. The effect of lawful provocation is to introduce into the case a basis for a finding against malice. The passion such provocation may or may not generate is, in a case in which it appears, inferable from it and whether that inference is to be drawn ordinarily is for the jury to determine in the light of all the circumstances and under the guidance of proper instructions. That an assault, of the kind the evidence for the defense tends to prove, by deceased upon Dudley Turner, was likely to kindle the flames of passion in his brother's mind seems hardly to be doubted in view of the relationship between the two and the natural inclination of the one to look upon the other's battles as his own. If it be true there was a conspiracy to kill in which appellant was implicated, or if the killing was from previous malice despite the provocation, or if, in fact, there was no provocation given, appellant's act was not manslaughter; but on the evidence adduced these were all questions for the jury to decide and to the end that they might perform that function an instruction on manslaughter was necessary.

VI.  The ruling sustaining an objection to appellant's testifying whether he believed his brother's life in danger at the time he struck is in accord with former decisions of this court (White v. Maxcy, 64 Mo. l. c. 560; State v. Gonce, 87 Mo. 627; State v. Downs, 91 Mo. 19) but we think those decisions ought to be overruled. In White v. Maxcy there was, the court said (l. c. 559), no evidence justifying the giving of an instruction on self-defense at all. What was said on the question now presented here was therefore *obiter*.

With respect to that case it is also to be observed that it was a civil action for damages decided prior to the enactment of the statute (Sec. 5242, R. S. 1909) permitting a defendant in a criminal case to testify in his own behalf and, consequently, the court could not possibly have had in mind the situation presented by this record. The other cases mentioned merely cite the first and take no further cognizance of the matter. The statute (Sec. 4451, R. S. 1909) is that homicide is "justifiable when committed by any person . . . in the lawful defense of such person or of his . . . brother . . . when there shall be reasonable cause to apprehend a design to commit a felony or to do some great personal injury, and there shall be reasonable cause to apprehend immediate danger of such design being accomplished . . . " In the practical application of this statutory rule, when the evidence tends to show the existence of the perfect right of self-defense, the jury is universally told that "if the defendant believed and had reasonable cause to believe" or if he "apprehended and had reasonable cause to apprehend" that his adversary was about to kill him or do him some great bodily harm ("some great personal injury") then they should acquit; and they are further told, and were so told in this case, that "it is not enough that defendant should have so believed but he must have had reasonable cause to so believe," etc. Instructions giving the jury the rule in this form have always been approved. This is a correct and practical statement of the law. Two things are required: (1) that defendant *believed* the danger imminent and (2) that there was, at the time, *reasonable cause* for that belief. It is true as stated in the cases cited above that if there is no evidence tending to prove the existence of reasonable cause for a belief that serious danger impends then defendant's actual belief is of no consequence for, absent the element of reasonable cause for such belief, there can be no self-defense in the case.

But if there is evidence tending to show reasonable cause for such belief then there remains the question as to the belief of defendant, as to his state of mind, and his testimony on this phase as to his state of mind, his belief at the time, is certainly competent. Of course his testimony on that head is not conclusive. The circumstances may, in the jury's estimation, refute that testimony. Nevertheless, it is competent and the weight to which it is entitled, it is the function of the jury to decide. The cases cited, in so far as they are in conflict with what is here said, are overruled.

The rule thus announced is in accord with the great weight of authority. [Com. v. Woodward, 102 Mass. 155; Williams v. Com., 90 Ky. 596; Upthegrove v. State, 37 Ohio St. 662; Duncan v. State, 84 Ind. 204; State v. Austin, 104 La. 409; Taylor v. The People, 21 Colo. 426; Berry v. State, 30 Tex. App. 423.]

VII.  So far as concerns the evidence offered as to the arrest of deceased at the instance of James Turner the fact of arrest was competent in connection with the threats made by deceased and as tending to show the basis of those threats. [State v. Bartlett, 170 Mo. 658.] Thus far the evidence was admitted. There was nothing in the offense for which deceased was arrested tending to indicate hostility toward appellant or his brother and the court was right in limiting the evidence to the proof of the arrest, that being the thing which gave rise to the threats proved.

The judgment is reversed and the cause remanded. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court. All the judges concur, except that *Ferriss, J.,* dissents from paragraph six of the opinion.