

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | **WD87138** |
| **v.** | ) | **OPINION FILED:** |
| | ) | **AUGUST 26, 2025** |
| **TERRANCE ANDRE JOHNSON, JR.,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
**The Honorable Kevin Crane, Judge**

**Before Division Four: Anthony Rex Gabbert, Chief Judge, Presiding,**
**Lisa White Hardwick, Judge, Janet Sutton, Judge**

Terrance A. Johnson, Jr. appeals the circuit court's judgment, entered on a jury verdict, convicting him of one count of first-degree assault (Count I), two counts of the class E felony of unlawful use of a weapon (Counts II and III), and one count of armed criminal action (Count IV). On appeal, Johnson contends the circuit court erred in refusing to submit to the jury his proposed defense-of-others instruction for Counts I, II, and III, and plainly erred in entering a written judgment and sentence for the class B felony of unlawful use of a weapon for Count II when he was found guilty of the class E felony of unlawful use of a weapon. For the reasons set forth below, we remand for a *nunc pro tunc* amendment to conform the written judgment to reflect Johnson's

convictions and the oral pronouncement of sentence, and affirm the judgment in all other respects.

## Factual and Procedural Background

Johnson does not challenge the sufficiency of the evidence to support his convictions. As relevant to Johnson's points on appeal, the evidence showed that on December 19, 2022, Johnson and his girlfriend[1] ("Girlfriend") parked their vehicle at a Break Time gas station pump in Columbia, Missouri around 3:30 p.m. Girlfriend was in the passenger seat. Victim was parked on the other side of the gas pump, facing the opposite direction. Girlfriend testified that, while Johnson was in the store, Johnson called Girlfriend and told her to pay attention because Victim was "walking in front of our car, pacing in front of our car." Girlfriend got off the phone and started paying attention. When Johnson returned from the store, he got in the vehicle. Victim pulled his car behind Johnson and Girlfriend's vehicle. According to Girlfriend, Victim said something to Johnson and "they started going back and forth" arguing. She could not hear what they were arguing about. Girlfriend heard no threats. At one point, Girlfriend heard Johnson ask Victim, "What does that mean?" before Johnson got back in their car and pulled a short distance away. Girlfriend was upset with Johnson, "rambling on and on," and told him that he needed to start listening to her when she told him to get in the car.

---

[1]Girlfriend had known Johnson since she was twelve years old, and had dated him for "three or four years" at the time of the incident.

Johnson jerked to a stop five seconds later in front of the Break Time door. He took a "Mini Draco" pistol from beside the console, jumped out, and started shooting. He did not tell Girlfriend he was going to do it, and did not explain why he was doing it. Girlfriend stayed in the vehicle. She had a gun in her purse, but never pulled it out. She testified that, if she thought there was imminent danger, or thought it was not safe, she would have gotten ready to pull out her firearm and exchange fire. She had not seen Victim with a gun, and Johnson did not tell her that Victim had a gun. Victim was initially in his vehicle, and once the shooting started, was out of his car behind the driver's door. Johnson ran toward Victim shooting, then backpedaled away while continuing to shoot across the parking lot.

Girlfriend saw Johnson running away. She climbed into the driver seat, drove the vehicle out of the parking lot, and picked up Johnson about twenty seconds later as he was running down Paris Road. She yelled at Johnson because she felt like they were going to be in trouble due to "the circumstances." She was "going off" on him and did not give him a chance to say anything. They sped home. Johnson's mother and siblings lived with them. Johnson ran into the house and quickly came back outside and left in his mother's car. Johnson went to St. Louis. The only correspondence Girlfriend had with Johnson after that was one phone call. It was from a number she did not recognize. Johnson told her that he was sorry and that he loved her.

A high school student who was at the gas station during the shooting testified that, he had just reentered his truck after filling it with gas when he heard yelling, screaming,

3

and then shooting to his left. He observed a man in a white vehicle get out and start shooting at a man at a gas pump in a red vehicle. He saw the gunman move forward toward the man in the red car as he first started to shoot, and then "started to backpedal, continuing to shoot." The student, "fearing for my life," took cover on the floorboard of his truck. He could hear bullets hitting his truck, and later observed bullet holes and severed wires. He recognized the gun used by the gunman from video games, music videos, and "pop culture" as a "Draco." When the bullets stopped, the student got out and saw the gunman's white vehicle up the hill, and the individual in the red vehicle lying on the ground by his car.

Another eyewitness ("H.E.") was at the Break Time pumping gas when he heard gunshots. He observed a man "aiming in a certain direction and backpedaling at a high speed," with "continuous firing while backpedaling." H.E. recognized the gunman's weapon from movies and videos as a "Draco," which H.E. described as "a mini AK-47." As the man with the gun moved in H.E.'s direction and got closer, H.E. took cover behind a truck. There were spent shell casings on the ground outside of H.E.'s car and near where H.E. had been standing. H.E. approached Victim after the shooting. H.E. never saw Victim with a firearm.

A woman ("Commuter") was traveling down Paris Road near Break Time when she heard what she thought was a car backfiring. She soon realized it was gunshots and saw a person shooting a gun and jumping backwards. Due to the amount of gunfire, she thought it was a "mass shooting." She saw a lot of people, but only one person with a

4

gun. Being a certified nursing assistant, she turned onto a street, parked behind a fire station, and ran to Break Time to see if she could help. She described the scene as "chaos," with "glass everywhere" and bystanders "panicking" and "freaking out."

Commuter saw Victim lying on the ground near a gas pump and a red car. There was "a lot of broken glass" near the car and it had "a bunch of bullet holes." Upon approaching Victim, she noticed he had a small gun (9mm) in his left hand. He did not point it at her, anyone else, or swing it around; he did not threaten anyone. Commuter told Victim that she was trying to help and asked him if he was going to shoot her. He told her no. She asked him to give up the gun, and he declined saying, "If someone comes back, I better have it." She rendered aid while he still held the gun, and he ultimately allowed someone else to take the gun. Commuter observed Victim with a gunshot wound through his lower abdomen on his right side which exited through his "butt cheek." Commuter used Victim's shirt and her hand to stop the bleeding. Commuter stepped aside when the police and ambulance arrived.

A crime scene investigator found twenty 7.62 rifle casings along the path that Johnson ran across the parking lot, but no other type of ammunition was found in the gas station parking lot. A police officer who took Victim's handgun testified that there was a round in the chamber when he was given the gun. The ammunition for this firearm was different than the spent ammunition casings found in the parking lot. An officer who collected Victim's belongings at the hospital testified that Victim had three magazines of

5

nine-millimeter ammunition, each of which held seven bullets. Two were full, and one was missing one bullet.

Johnson was eventually apprehended by authorities in St. Louis. When taken into custody, Johnson "was very upset" and began "ranting about the Columbia Police Department," stating that he fled to St. Louis to gather money for a lawyer. Among other things, Johnson said something to the effect of, "This is all over a convicted felon rolling up on me and shooting at me and me shooting back in self-defense."

Johnson was charged by indictment with the class B felony of assault in the first degree pursuant to Section 565.050[2] (Count I), one count of the class B felony of unlawful use of a weapon pursuant to Section 571.030 (Count II), one count of the class E felony of unlawful use of a weapon pursuant to Section 571.030 (Count III), and one count of the unclassified felony of armed criminal action pursuant to Section 571.015 (Count IV).

The case was tried before a jury March 5-6, 2024. Johnson's defense was that Victim pulled a weapon on him after a heated argument, causing Johnson to fear for his life and defend himself. Johnson requested the jury be instructed on self-defense, and the court did so over the State's objection. Johnson additionally requested a defense-of-others instruction. His counsel argued that the evidence showed that, "the rounds used by [Victim] could have punctured through that car and could have hit [Girlfriend]." Further,

[2]All statutory references are to the Revised Statutes of Missouri, as updated through 2022, unless otherwise noted.

appellate courts had found plain error when a trial court fails to *sua sponte* give a defense-of-others instruction where substantial evidence was adduced at trial warranting the instruction. The circuit court declined to give the instruction, finding no evidence presented during trial that Johnson was acting in defense of Girlfriend.

The jury found Johnson guilty on all counts as presented to them. For Count II, the State initially charged Johnson with the class B felony of unlawful use of a weapon under Section 571.030(9) for discharging or shooting a firearm at or from a motor vehicle. At trial, the instruction submitted to the jury was MAI-CR 4th 426.10, for a violation under Section 571.030(3) for the class E felony of discharging or shooting a firearm into a dwelling house, a railroad train, boat, aircraft, or motor vehicle. The jury found Johnson guilty under this instruction. When the discrepancy was brought to the court's attention, the court ruled that, because the class E felony version of the offense was submitted to the jury, Johnson could only be found guilty of the class E felony version of the offense. (The written judgment, however, stated that Johnson was found guilty of the class B felony of unlawful use of a weapon for Count II.)

The trial court followed the recommendations of the jury, sentencing Johnson to nine years on Count I, two years on Count II, one year on Count III, and three years on Count IV. The court ordered the sentences for Counts I, II, and IV to be served consecutively, with the sentence for Count III to run concurrent to the other sentences.

This appeal follows.

7

## Point I – Defense-of-Others Instruction

In his first point on appeal, Johnson contends the circuit court erred in refusing to submit to the jury his proposed defense-of-others instruction for Counts I, II, and III, arguing that he presented substantial evidence supporting that Johnson reasonably believed Victim brandished or aimed a firearm at Johnson prior to Johnson discharging his own weapon. As Girlfriend was in close proximity to Johnson at the time Victim brandished his weapon, it was reasonable for Johnson to believe he had the right to use deadly force to prevent Girlfriend from being shot, killed, or inflicted with serious physical injury.

Whether the jury was properly instructed is a question of law we review *de novo*. *State v. Thompson*, 711 S.W.3d 339, 349 (Mo. banc 2025). A judgment will be reversed on instructional error only if the error misled the jury and prejudiced the defendant. *Id.* "The error must be so prejudicial that the defendant was deprived of a fair trial." *Id.*

> If the defendant injects self-defense into the case and there is substantial evidence to support a self-defense instruction, it is reversible error for the trial court to fail to submit a self-defense instruction to the jury…. *State v. Westfall,* 75 S.W.3d 278, 281 n. 9 (Mo. banc 2002). The defense-of-others justification is essentially an extension of the self-defense justification, in that the actor may do in another's defense anything the person himself may have lawfully done in the circumstances. *State v. Grier,* 609 S.W.2d 201, 204 (Mo.App.1980); *State v. Turner,* 246 Mo. 598, 152 S.W. 313, 316 (1912). It follows that, if the defendant carries the burden of introducing substantial evidence to support a defense-of-others instruction, it is error for the trial court to fail to submit a defense-of-others instruction to the jury…[.]

*State v. Bolden*, 371 S.W.3d 802, 805 (Mo. banc 2012). "When reviewing a claim of error related to instructing on a justification defense, we view the evidence in the light most favorable to the defendant." *State v. Caldwell*, 655 S.W.3d 374, 378 (Mo. App. 2021) (internal quotation marks and citations omitted).

Section 563.031 provides in relevant part:

> 1. A person may, subject to the provisions of subsection 2 of this section, use physical force upon another person when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person unless:
>
> (1) The actor was the initial aggressor; …
> …
>
> 2. A person shall not use deadly force upon another person under the circumstances specified in subsection 1 of this section unless:
>
> (1) He or she reasonably believes such deadly force is necessary to protect himself…or another against death, serious physical injury, or any forcible felony;
> ….
>
> 5. The defendant shall have the burden of injecting the issue of justification under this section….

We find no error in the circuit court's refusal to instruct the jury on defense-of-others. Johnson did not inject defense-of-others into his case, and did not introduce substantial evidence to support a defense-of-others instruction.

Johnson's defense was that he acted in self-defense. In his opening statement to the jury, Johnson's attorney stated that the evidence was going to show that, after a

9

heated argument at the gas pump, Johnson asked Victim, "What are you going to do?", and Victim allegedly responded by stepping outside of his car with a loaded 9-millimeter handgun. Victim had twenty additional rounds of ammunition in his pocket and, "at the distance we're talking about, a couple feet, all of those rounds, any of them, would have been lethal to Mr. Johnson." Johnson was, he argued, thrust into a life-or-death situation, so he "pulled a short way away, armed himself, and prepared to face [Victim]." Counsel stated that, "after a short engagement, Mr. Johnson would retreat from the scene. He would not be able to confirm if [Victim] had been hit. He would not be able to confirm if [Victim] was still following him. He simply got out of there as soon as he could." Counsel argued that, Johnson "had thirty-one seconds to decide whether or not this was going to be his last thirty-one seconds. And he made the only decision he could."

While an opening statement is not evidence, nothing within Johnson's opening statement suggests that Johnson intended for the evidence to show that he was acting in defense of anyone but himself. Girlfriend testified that she had no idea Johnson was going to jump out of their vehicle and open fire on Victim, and she sat "surprised" in the passenger seat when Johnson's shooting began, unsure of what to do. If Johnson was unable to confirm if Victim was "following" Johnson or if Victim had been hit by Johnson's gunfire when Johnson "retreat[ed] from the scene," it follows that Johnson could not have been defending Girlfriend. He left Girlfriend behind to potentially be shot by Victim as she sat stunned in the passenger seat of their vehicle.

10

Girlfriend testified that Johnson got back into their vehicle after arguing with Victim, drove forward, jerked to a stop, grabbed his weapon, jumped out, and began shooting. No bystanders, including Girlfriend, heard gunshots prior to Johnson opening fire. No bystanders, including Girlfriend, saw Victim with a weapon prior to Johnson leaving the scene. There was no evidence that Victim ever shot his weapon. It is unclear from the evidence when Victim first took hold of the nine-millimeter handgun. Johnson made no statements to Girlfriend, prior to or following the shooting, as to why he shot Victim. The only statement Girlfriend recalled hearing Johnson make to Victim was, "What does that mean?" There was no other evidence as to the content of Johnson's and Victim's verbal exchange, and, consequently, no evidence that anything Victim said was threatening toward Girlfriend (or Johnson).

Johnson fled the scene on foot, and fled town after the shooting. His only subsequent communication with Girlfriend was a telephone call stating that he loved her and was sorry. Once arrested in St. Louis, Johnson stated to police: "This is all over a convicted felon rolling up on *me* and shooting at *me* and me shooting back in *self-defense*." Nothing about this statement suggests that Johnson reasonably believed he was using deadly force to protect anyone but himself.

The circuit court did not err in refusing Johnson's proposed defense-of-others instruction as Johnson introduced no substantial evidence to warrant the instruction. Even if he had, he cannot prove any prejudice by the court's refusal of the instruction. In advocating for the instruction, Johnson argued to the court that Girlfriend was in a vehicle

11

in close proximity to Victim, and Victim could have shot into her vehicle and seriously injured or killed her. Counsel stated that, Victim "may have shot at Mr. Johnson" and Girlfriend was "right next to him" and there "very well could have been shots fired into her." As Johnson's self-defense theory rested on the same factual premise as his defense-of-others theory, and the jury considered and rejected that Johnson acted in self-defense, there is no reasonable likelihood the outcome of Johnson's trial would have been different had the court given a defense-of-others instruction.

Johnson's first point on appeal is denied.

## Point II - Clerical Error in Written Judgment

In his second point on appeal, Johnson contends the circuit court plainly erred in entering written judgment and sentence for the class B felony of unlawful use of a weapon for Count II after Johnson was found guilty of the class E felony of unlawful use of a weapon and the court's oral pronouncement of sentence was for the class E felony. He requests remand to the circuit court for entry of a *nunc pro tunc* amendment accurately memorializing the jury verdict and the circuit court's oral pronouncement.

This point is not preserved for appellate review and Johnson requests review for plain error. "Whether an unpreserved claim is statutory, constitutional, structural, or of some other origin, Rule 30.20 is the exclusive means by which an appellant can seek review of any unpreserved claim of error and said claim ... is evaluated by this Court's plain error framework without exception." *State v. Mills*, 687 S.W.3d 668, 675 (Mo. banc 2024) (internal quotation marks and citation omitted).

12

In conducting plain error review, the Court conducts a two-step process:

> The first step requires a determination of whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear. If plain error is found, the court then must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

*Mills*, 687 S.W.3d at 675. *Id.* (internal quotation marks and citation omitted).

The written judgment of the trial court should reflect its oral pronouncement of sentence. *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 514 (Mo. banc 2010) (overruled on other grounds). Where an oral pronouncement materially differs from the written judgment, the oral pronouncement controls. *State v. Robinson*, 685 S.W.3d 32, 34 (Mo. App. 2024). A written judgment that does not conform to the trial court's oral pronouncement of sentence contains clerical errors that may be corrected *nunc pro tunc*. *State v. Denham*, 686 S.W.3d 357, 371 (Mo. App. 2024).

The State concedes this point, and agrees that the circuit court plainly erred in entering a written judgment that materially differed from the jury verdict and the court's oral pronouncement, requiring remand for entry of a *nunc pro tunc* amendment which correctly memorializes the verdict and oral pronouncement of sentence.

Johnson's second point on appeal is granted.

## Conclusion

We reverse the circuit court's judgment to the extent that it failed to properly memorialize the verdict and oral pronouncement of sentence, and remand for entry of a

*nunc pro tunc* amendment which correctly does so.  The judgment is affirmed in all other respects.

_____

Anthony Rex Gabbert
Chief Judge

All concur.